**FRIENDS OF THE EARTH, a New York non-profit corporation; Pilchuck Audubon Society, a Washington non-profit corporation; Puget Sound Alliance, a Washington non-profit corporation; Seattle Audubon Society, a Washington non-profit corporation; Sierra Club, a California non-profit corporation; Washington Environmental Council, a Washington non-profit corporation, Plaintiffs–Appellants,**

v.

**UNITED STATES NAVY, an agency of the United States and; James H. Webb, Jr., in his capacity as Secretary of the Navy, Defendants–Appellees.**

No. 87–4304.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 8, 1988.

Decided March 7, 1988.

928

Victor M. Sher, Sierra Club Legal Defense Fund, Inc., Seattle, Wash., for plaintiffs-appellants.

J. Carol Williams, Dept. of Justice Land & Natural Resources Div., Washington, D.C., for defendants-appellees.

Before SKOPIL, REINHARDT and LEAVY, Circuit Judges.

LEAVY, Circuit Judge:

The appellants, Friends of the Earth and other environmental organizations (FOE), appeal the denial of their motion to preliminarily and permanently enjoin construction of the United States Navy's proposed homeport in Everett, Washington on Puget Sound. FOE alleges that by commencing construction prior to termination of review proceedings concerning a Shoreline Management Act permit, the Navy is in violation of the National Defense Authorization Act, the Administrative Procedure Act, the Federal Water Pollution Control Act, and the Washington Shoreline Management Act.

The district court denied FOE's motion, finding that no irreparable harm would occur until June 15, 1988 and that FOE lacked standing. We reverse.

FACTS AND PROCEDURAL HISTORY

The Navy plans to build a $272 million permanent "Carrier Battle Group Homeport" at Everett, Washington as part of the Navy's comprehensive defense strategy. The homeport will provide berthing and base facilities for the aircraft carrier USS Nimitz and numerous support ships and service vessels. Establishment of the homeport will entail extensive demolition and construction over several hundred acres. All buildings, piers, and wharves currently at the site will be demolished. New buildings, utilities, and parking areas will be constructed. The existing "mole" [1] will be rebuilt and a 1600 foot breakwater will be constructed. Extensive dredging of the harbor to accommodate the Navy vessels will occur.

The issue of concern to the plaintiffs is the Navy's proposal to dredge approximately 3.4 million cubic yards of sediment from the East Waterway in Everett Harbor and dispose of these spoils in Port Gardner Bay at depths of 310 to 430 feet, using a dredge spoil disposal technique called Confined Aquatic Disposal (CAD). Approximately one-third of the dredge spoils are contaminated with heavy metals and organic compounds. The CAD disposal system involves in-water disposal of contaminated dredge spoils followed by disposal of clean sediment which, theoretically, will cap and isolate the contaminated material from the marine environment.

The CAD method is experimental at these depths and the harm to the marine environment which would occur should the contaminated spoils not be contained would be substantial. The United States Fish and Wildlife Service (FWS), in its report *Impacts of the Proposed Navy Homeporting Project, Everett, Washington*, stated: "[CAD] has only been attempted twice at depths approaching those of the proposed disposal site, and in those cases, the effort

was considered a failure, apparently because of an inability to accurately place the material at the site." The FWS opposes the dredging project as currently proposed. The United States National Marine Fisheries Service (NMFS), in a letter to the Army Corps of Engineers (Corps), stated: "The NMFS remains opposed to the Navy's proposal to dispose of nearly one million cubic yards of contaminated sediments by repositioning them in Puget Sound.... because such disposal would have unacceptable adverse impacts on aquatic and fishery resources." The FWS and NMFS support use of an upland site for disposal of the dredge spoils because the technology concerning how to contain the spoils is far better known and the site could be better monitored.

Two sections of the Federal Water Pollution Control Act (Clean Water Act or CWA) require the Navy to comply with all state and local requirements concerning the discharge of dredged and fill materials and the control of water pollution. 33 U.S.C. §§ 1344(t), 1323 (1986). Section 2207 of the National Defense Authorization Act of 1987 (NDAA) prohibits the Navy from obligating or spending funds for construction of the Everett homeport until "all Federal, state, and local permits required for the dredging activities to be carried out with respect to homeporting at Everett, Washington, have been issued." National Defense Authorization Act for Fiscal Year 1987, Pub.L. No. 99–661, § 2207 (1986) (NDAA for 1987).

The Navy has received some required permits and certifications. Under the Rivers and Harbors Act of 1899, 33 U.S.C. § 407 (1986), and section 404 of the Clean Water Act, 33 U.S.C. § 1344 (1986), the Navy must obtain from the Army Corps of Engineers a "404 permit" before it may discharge dredged or fill material into the navigable waters of the United States. The Navy obtained this permit on September 24, 1987. Under section 401 of the Clean Water Act, 33 U.S.C. § 1341 (1986), the state of Washington must certify that

---

1. The "mole" is a manmade projection of land    that juts into the water.

the activities authorized by the 404 permit will not adversely affect water quality (Water Quality Certification or 401 certification). The state issued the certification on March 2, 1987.

The permit about which the parties are in dispute comes under the state of Washington's Shoreline Management Act (SMA) and would be obtained from the city of Everett. Wash.Rev.Code §§ 90.58.010–.930 (West Supp.1987). The Navy initially refused to apply for this permit, contending it had sovereign immunity. However, eventually the state and the Navy entered into a Memorandum of Agreement (MOA). The Navy, without waiving any sovereign immunity, agreed to apply to the city of Everett for a SMA permit, and also agreed "to comply with all conditions of the permit related to water quality and aquatic life in Puget Sound and Gardner Bay and further ... to comply with all other reasonable and appropriate permit conditions." The MOA stated that any conditions would be included in the 404 permit. The state conditioned its issuance of the 401 certification on the Navy submitting the homeport project to the SMA permit process.

On March 2, 1987, the Navy applied to the city of Everett for a "conditional use shoreline substantial development permit" under the SMA for construction of the homeport in Everett's shoreline area. The application stated that the permit was requested for dredging and disposal of dredge spoils. The city approved the permit, subject to certain conditions, on June 10, 1987. The permit allows among other things, dredging and disposal of dredge spoils.

The Washington Department of Ecology (WDOE) reviewed the permit, as required by the SMA, Wash.Rev.Code § 90.58.140(12), and approved it, with additional conditions, on July 8, 1987. The permit contains the following language:

> Construction pursuant to this permit will not begin or is not authorized ... until all review proceedings initiated within thirty days from the date of [this permit] have terminated.

This restriction is required by the SMA. Wash.Rev.Code § 90.58.140(5).

On July 30, 1987, the plaintiffs filed a request for review of the SMA permit with the state Shorelines Hearings Board (Board), in accordance with the review procedures established in the SMA. Wash. Rev.Code § 90.58.180. At the time of oral argument in this case, the Board had held two weeks of hearings on the permit, and more hearings were scheduled.

In August and September 1987, while the plaintiffs' appeal to the Board was pending, the Navy solicited and accepted bids for site preparation and shore utility construction. On September 29, 1987, the Navy awarded a $26 million contract for this work.

The contract calls for demolition, excavation, and subgrading of the entire homeport site, followed by construction of the homeport's infrastructure, including utilities, roads, and parking lots. The contract also involves some in-water work, including demolition of all existing waterfront structures, such as wharves, piers, and pilings; construction of riprap; and removal of debris. The Navy maintains this contract does not involve dredging; dredging will be the subject of a future contract under the same SMA permit. In contrast, FOE claims, and supports by the affidavit of an expert, that the contract does involve dredging as well as significant in-water demolition and filling, all of which may adversely affect water quality.

The contract specifies that no in-water work will commence until after June 15, 1988. However, the Navy concedes that because the definition of "in-water" in the contract differs from the state's definition, work is authorized prior to June 15 which, in high tides and extreme high tides, would be in the water.

FOE filed its complaint in district court and moved for a preliminary and permanent injunction barring the Navy from obligating or expending any funds, and from commencing any construction of the homeport, until all shoreline permit review proceedings have terminated. The district court denied the motion for a preliminary

injunction on two grounds. First, the court found that FOE failed to show that irreparable harm would occur if the injunction did not issue. The court stated: "No activity that will significantly disturb that [contaminated bottom] sediment is planned until at least June 15, 1988, several months after the scheduled date for the hearings before the Shoreline Hearings Board." Second, the court found that FOE lacked standing. The court stated that "because there is no imminent environmental harm, the plaintiffs lack standing to employ the Administrative Procedures Act ... to challenge the Navy's alleged violations of the NDAA." The court noted that the NDAA does encompass environmental interests. However, it found that even if the Navy is in violation of the NDAA, the plaintiffs have no specialized injury separate from the injury suffered by the general public. FOE appeals the district court's denial of its injunction motion.

## STANDARD OF REVIEW

■ This court reviews a denial of a preliminary injunction motion to determine whether the district court abused its discretion or based its decision on an erroneous legal standard or clearly erroneous findings of fact. *Sierra Club v. Marsh*, 816 F.2d 1376, 1381–82 (9th Cir.1987). This court may decide the merits of a case on appeal from the denial of injunctive relief if the plaintiff requested both preliminary and permanent relief, the record was fully developed before the district court, and the district court's denial rested primarily on interpretations of law. *Id.* at 1382.

FOE requested both preliminary and permanent injunctive relief from the district court. The Navy joined FOE in requesting the district court to rule on the merits and both sides fully briefed the merits. The district court's denial of injunctive relief rested primarily on questions of law. In reversing the district court we also, of necessity, reach the merits of this action.

## DISCUSSION

### A. *Standing*

■ To demonstrate standing, Article III of the United States Constitution requires the plaintiffs to show that they or their members have personally suffered an actual or threatened injury due to the defendant's allegedly illegal conduct, that the injury can fairly be traced to the challenged conduct, and that the injury is likely to be redressed by a favorable decision. *Fair v. United States EPA*, 795 F.2d 851, 853 (9th Cir.1986) (citations omitted). *See Sierra Club v. Morton*, 405 U.S. 727, 734–40, 92 S.Ct. 1361, 1365–69, 31 L.Ed.2d 636 (1972).

■ The plaintiffs satisfy the standing requirements of Article III. Section 2207 of the NDAA prohibits the expenditure of funds for any construction of the Everett homeport until "all Federal, state, and local permits required for the dredging activities ... have been issued." NDAA for 1987, § 2207. Congress' purpose in enacting Section 2207 was to ensure that the environmental consequences of dredging are fully considered before funds for construction of the homeport are obligated. Conf. Rep. to NDAA for 1987. The plaintiffs alleged that the Navy's commencement of homeport construction prior to completion of the SMA permit review process threatens harm to the environment of Puget Sound because the permit is "required" and has not been "issued." Therefore, environmental concerns about dredging have not been fully considered. This court has long recognized that failure to follow procedures designed to ensure that the environmental consequences of a project are adequately evaluated is a sufficient injury in fact to support standing. *City of Davis v. Coleman*, 521 F.2d 661, 671 (9th Cir.1975).

The plaintiffs also alleged, as they must under *Sierra Club v. Morton*, the particular injury their members incur by the Navy's action. 405 U.S. at 734–35 & n. 8, 92 S.Ct. at 1365–66 & n. 8. The complaint alleges that the plaintiffs' members live in and around Everett and use the shoreline and waters of Everett Harbor, Port Gardner Bay, and Puget Sound for environmental, scientific, aesthetic, economic, and recreational activities. It further alleges these interests would be affected directly

and adversely by construction of the homeport without adequate environmental review and protection. Such threatened harm to the environment is sufficient to amount to an "injury in fact" for purposes of standing. *Id.* The plaintiffs have demonstrated their members meet the injury in fact standard stated in *City of Davis:*

> The procedural injury implicit in agency failure to prepare an EIS—the creation of a risk that serious environmental impacts will be overlooked—is itself a sufficient "injury in fact" to support standing, provided this injury is alleged by a plaintiff having a sufficient geographical nexus to the site of the challenged project that he may be expected to suffer whatever environmental consequences the project may have. This is a broad test, but ... an appropriate test.

521 F.2d at 671. *See also Oregon Environmental Council v. Kunzman,* 817 F.2d 484, 491 (9th Cir.1987).

Thus, the plaintiffs have demonstrated that their members will suffer injury in fact by the Navy's alleged failure to follow environmental procedures. This injury is fairly traceable to the Navy's action in commencing construction prior to completion of the SMA review process. Finally, the plaintiffs' injury would be redressed by a favorable decision enjoining the Navy from construction prior to completion of the permit review process.

■ The plaintiffs must also satisfy the statutory requirements for standing under the APA, by demonstrating that their alleged injury is within the zone of interests protected by the statute allegedly violated. *Fair,* 795 F.2d at 854. The Supreme Court recently explained that the zone of interest test denies judicial review only

> if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff.

*Clarke v. Securities Indus. Ass'n,* —— U.S. ——, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987).

The plaintiffs' alleged injuries fall within the NDAA's zone of interest for purposes of standing under the APA. In enacting section 2207 of the NDAA, Congress stated:

> [T]o ensure that environmental concerns are fully addressed prior to the initiation of construction at the base, the conferees have prohibited the obligation and expenditure of fiscal year 1987 military construction funds for the Everett homeport until all Federal, state and local permits for dredging have been issued.

Conf.Rep. to NDAA for 1987. Congress included this same restriction in the National Defense Authorization Act for Fiscal Years 1988 and 1989. Pub.L. No. 100–180, § 2322 (1987).

The language of section 2207 and its legislative history demonstrate that Congress intended that environmental impacts of the homeport be fully evaluated prior to construction. The injuries alleged by the plaintiffs, environmental organizations with a demonstrated interest in the same issues about which Congress is concerned, fall within the NDAA's zone of interest.

The Navy contends that FOE lacks standing because, it claims, the only environmental concerns within the zone of interest protected by the NDAA are those associated with dredging activities. The Navy claims the construction contract does not involve dredging, and therefore awarding of the contract is not causally related to the plaintiffs' alleged injury. The parties disagree about whether the contract involves dredging. Moreover, the Navy's argument glosses over the explicit language in section 2207 which prohibits expenditure of funds for *any* construction until all permits required for dredging activities have been issued. Congress linked all construction to ensuring the environmental effects of dredging are considered, and repeated this linkage in the NDAA for fiscal years 1988 and 1989. Attenuation of the causal link between the alleged failure of the Navy to comply with the NDAA and the

possible injury to the plaintiffs does not defeat standing. *City of Davis*, 521 F.2d at 671.

In conclusion, the plaintiffs have standing under Article III and the APA to maintain this action. The district court relied on an erroneous legal standard in reaching the opposite conclusion.

### B. *Preliminary and Permanent Injunctive Relief*

A party is entitled to a preliminary injunction if it demonstrates: (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in favor of the party seeking relief. *Marsh*, 816 F.2d at 1382. These are not two independent tests, but the extremes of the continuum of equitable discretion. *Id.* at 1382–83. However, the Supreme Court has recognized this is not the test for injunctions under every statute.

In *TVA v. Hill*, 437 U.S. 153, 193–95, 98 S.Ct. 2279, 2301–02, 57 L.Ed.2d 117 (1978), the Supreme Court held that Congress explicitly foreclosed the courts' traditional equitable discretion when faced with a violation of section 7 of the Endangered Species Act (ESA), 16 U.S.C. § 1536. The court found that section 7 of the ESA commanded all federal agencies "to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence of an endangered species.... This language admits of no exception." *Id.* at 173. The Court stated that the "language, history, and structure" of the ESA demonstrates Congress' determination that the balance of hardships and the public interest tip heavily in favor of endangered species. *Id.* at 174, 187–88, 194–95. Thus, Congress removed from the courts their traditional equitable discretion in injunction proceedings. "We may not use equity's scales to strike a different balance." *Marsh*, 816 F.2d at 1383.

■ As in *TVA v. Hill*, an examination of the language, history, and structure of the NDAA demonstrates that Congress in-

tended that no construction should commence prior to issuance of all required permits. Because we find the SMA permit is "required" and has not been "issued," the district court erred in denying the injunction.

Section 2207 of the NDAA explicitly prohibits the obligation or expenditure of funds for any construction of the homeport until all federal, state, and local permits required for dredging activity have been issued. The Conference Report accompanying section 2207 demonstrates Congress' intention that environmental concerns about dredging activities be "fully addressed" before any homeport construction occurs. Congress re-emphasized this intent in its recent enactment of the National Defense Authorization Act for Fiscal Years 1988 and 1989. Section 2322 provides that funds may not be obligated or expended for construction of the Everett homeport until

> all Federal, State, and local permits required for the dredging activities to be carried out with respect to homeporting ... have been issued, including all permits required pursuant to, or otherwise in connection with, the Federal Water Pollution Control Act.

Pub.L. No. 100–180, § 2322 (1987). The House Committee on Armed Services explained this provision:

> The provision would extend the prohibition for fiscal year 1988 funds and would specifically require that permits required under the Federal Water Pollution Control Act be obtained before these funds are released. By "dredging activities", the committee means permits concerning disposal of the dredge spoil as well as the dredging itself.

H.R.Rep. No. 58, 100th Cong., Rep. of the Comm. on Armed Services on H.R. 1748 (April 15, 1987).

Like the Endangered Species Act, section 2207 is directed at a specific environmental issue—the removal and disposal of dredge spoils connected with construction of the Everett homeport. Congress explicitly prohibited expenditure of funds for any construction until all permits required for dredging have been issued. Congress

could hardly have been more clear in its intent. Thus, Congress has removed from the courts their equitable discretion.

The Navy relies on *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982), to support its position that the court's discretion is not limited by the NDAA. In *Romero–Barcelo*, an action was brought seeking to enjoin the Navy from using an island off the coast of Puerto Rico and the surrounding waters for naval training purposes. Accidental bombings of the waters occurred. The plaintiffs sought the injunction on the ground, among others, that the Navy was polluting the waters without first obtaining a permit, as required under the Clean Water Act. The Supreme Court held that although a permit was required, the Clean Water Act did not dictate that the district court issue an injunction. The Court found that it was within the district court's discretion simply to order the Navy to apply for a permit.

In reaching this conclusion, the Court found that unlike the ESA, the CWA did not foreclose the court's traditional equitable discretion. The Court distinguished the CWA from the ESA on several grounds: (1) the CWA's prohibition against discharge of pollutants without a permit can be overcome by the very permit the district court ordered the Navy to seek, (2) the statutory scheme of the CWA does not contemplate immediate cessation of all unpermitted discharges, and (3) because other forms of relief are available under the CWA, equitable discretion is appropriate to allow the court to order the relief it considers necessary to secure prompt compliance with the CWA. *Id.* at 315–18, 102 S.Ct. at 1804–06.

This court in *Marsh* explained that in *Romero–Barcelo* the Supreme Court "carefully distinguished" the language of the statute at issue to determine whether Congress intended the courts to retain their equitable discretion. *Marsh*, 816 F.2d at 1384. The factors preserving the court's equitable discretion in *Romero–Barcelo* are not present here. First, the NDAA provides only one method of achieving its purpose: withholding of funds for all construction until all permits required for dredging have been issued. Second, no alternative remedy exists that would protect these concerns. Third, compliance with the NDAA cannot be obtained by an order to the Navy, short of ordering it to cease construction until the permit review process is complete, *i.e.*, an injunction.

The NDAA limits the discretion of the courts, because by its plain language, Congress has already struck a balance favoring environmental review prior to construction of the homeport. Congress provided only one method to achieve its purpose. Thus, the district court lacked equitable discretion to deny the injunction. The plaintiffs are entitled to permanent injunctive relief.

1. The SMA Permit is "Required" and Has Not Been "Issued"

   a. *The SMA Permit is Required*

In the Clean Water Act, Congress waived the federal government's sovereign immunity with respect to state regulation of dredging and water pollution. Section 1344(t) provides:

> Nothing in this section shall preclude ... the right of any State ... agency to control the discharge of dredged or fill material in ... the navigable waters within the jurisdiction of such State, including any activity of any Federal agency, and each such agency shall comply with such State or interstate requirements both substantive and procedural to control the discharge of dredged or fill material to the same extent that any person is subject to such requirements.

33 U.S.C. § 1344(t). Section 1323 provides:

> Each [federal agency] ... shall ... comply with ... all ... State ... and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity.... [This] shall apply (A) to any requirement whether substantive or procedural (including ... any requirement respecting permits and any other requirement, whatsoever), (B) to the exercise of

any ... State, or local administrative authority, and (C) to any process and sanction.... This subsection shall apply notwithstanding any immunity of such agencies ... under any law or rule of law. 33 U.S.C. § 1323.

The Navy does not dispute that these sections waive its sovereign immunity under the Clean Water Act. *See, e.g., Northwest Indian Cemetery Protective Ass'n v. Block,* 795 F.2d 688, 697 (9th Cir.1986), *petition for cert. granted on other grounds,* — U.S. —, 107 S.Ct. 1971, 95 L.Ed.2d 812 (1987). However, the Navy does contend that the SMA is not a state program "to control the discharge of dredged or fill material" or a state or local requirement "respecting the control and abatement of water pollution." Rather, the Navy argues that the SMA is essentially a land use law implementing the state's Coastal Zone Management Program, for which there has not been a waiver of sovereign immunity. The Navy also argues that the SMA permit is merely duplicative of the Navy's 404 permit. We disagree.

■ We find that Washington's Shoreline Management Act regulates and controls dredging and water quality within Washington's shoreline area. The Act states as one purpose "protecting against adverse effects to ... the waters of the state and their aquatic life.... [U]ses shall be preferred which are consistent with control of pollution." Wash.Rev.Code § 90.58.020. The implementing regulations include a component on dredging, which provides that:

Local governments should control dredging to minimize damage to existing ecological values and natural resources of both the area to be dredged and the area for deposit of dredged materials.

Wash.Admin.Code § 173–16–060(16)(a).

The Act requires local jurisdictions to adopt master Shoreline Master Programs (SMP) that, among other things, protect water quality and aquatic life and control dredging activities. Wash.Rev.Code §§ 90.58.020,–.030(3)(b); Wash.Admin.Code § 173–16–060(16). The SMPs "constitute use regulations for the various shorelines of the state." Wash.Rev.Code § 90.58.100(1). The city of Everett's Shoreline Master Program implements the SMA, including its dredging requirements. The Everett SMP contains specific policies and regulations governing dredging and disposal of dredge materials.

The Washington Supreme Court has declared that the Act authorizes local jurisdictions to impose water quality controls on substantial developments which require a SMA permit. *Weyerhaeuser Co. v. King County,* 91 Wash.2d 721, 592 P.2d 1108 (1979). In doing so, the court upheld a determination by the state Shorelines Hearings Board that "water quality is a vital consideration ... under the SMA and ... '[c]onditions of a permit relating to water quality are in furtherance of one of the many policies of the Act, namely, the protection of water quality.'" *Id.* at 734, 592 P.2d at 1115–16. The Navy's shoreline permit reflects the dredging and water quality provisions of the SMA and Everett's SMP.

The language of the SMA, its implementing regulations, and the Washington Supreme Court's finding in *Weyerhaeuser* lead to the conclusion that the SMA does "control the discharge of dredged or fill material" and is a state requirement "respecting the control and abatement of water pollution." The Everett SMP, and the Navy's permit approved pursuant to it, are part of that state program. The shoreline permit applies state and local dredging regulations to the Navy's proposed dredging activities. Therefore, pursuant to the Clean Water Act, the shoreline permit is "required" within the meaning of the NDAA.

■ The Coastal Zone Management Act (CZMA), 16 U.S.C. §§ 1451–1464 (1985 & Supp.1987), was enacted to encourage wise use of coastal resources through state adoption and implementation of management programs for the coastal zone. 16 U.S.C. § 1452. Washington's Coastal Zone Management Program, the core of which is the SMA, was adopted pursuant to the CZMA. The CZMA states that federal agencies "conducting or supporting activities directly affecting the coastal zone shall

conduct or support those activities in a manner which is, to the maximum extent practicable, consistent with approved state management programs." 16 U.S.C. § 1456(c)(1).

The Navy contends this means its sovereign immunity has not been waived for purposes of the CZMA. However, the CZMA itself specifically provides that it does not interfere with the requirements of the Clean Water Act:

Notwithstanding any other provision of [the CZMA], nothing in [the CZMA] shall in any way affect any requirement (1) established by the Federal Water Pollution Control Act ... or (2) established by the Federal Government or by any state or local government pursuant to such Act[ ].

16 U.S.C. § 1456(f). Therefore, the CZMA does not allow the Navy to avoid the requirements of the CWA.

■ The Navy next argues that the SMA is primarily a land use planning scheme implementing the CZMA, and therefore is not applicable to the Navy's activities in the coastal zone, much of which will allegedly occur on federal lands. The CZMA excludes federal lands from the "coastal zone" subject to state management. 16 U.S.C. § 1453(1).

The Supreme Court rejected this argument in *California Coastal Comm'n v. Granite Rock Co.*, —— U.S. ——, 107 S.Ct. 1419, 94 L.Ed.2d 577 (1987). The California Coastal Commission constitutes California's coastal zone management program for purposes of the CZMA. *Id.* 107 S.Ct. at 1423. The Coastal Commission had instructed the defendant, a mining company, to apply for a coastal development permit for any mining it undertook on federal lands within the coastal zone. The Coastal Commission stated that the permit's purpose was to impose environmental regulations, not land use planning controls, on Granite Rock's mining operation. *Id.* at 1427–28, 1429. Granite Rock brought suit, alleging that the permit requirement was pre-empted by Forest Service regulations, federal land use statutes, and the CZMA. The Court rejected Granite Rock's argu-

ment that the CZMA's exclusion of federal lands from the coastal zone excluded those lands from all state coastal zone regulation. *Id.* at 1431. The Court held that the environmental permit requirements of a state statute with both environmental and land use purposes apply to activities on federal land. The Court stated:

The line between environmental regulation and land use planning will not always be bright.... However, the core activity described by each phrase is undoubtedly different. Land use planning in essence chooses particular uses for the land; environmental regulation, at its core, does not mandate particular uses of the land but requires only that, however the land is used, damage to the environment is kept within prescribed limits.

*Id.* at 1428.

The SMA, as described above, is a mixed statute containing both land use and environmental regulations. The provisions of the SMA, Everett SMP, and the shoreline permit relating to dredging and water quality are environmental regulations. They do not mandate any particular use of the land, but only impose conditions to ensure that damage to the water is kept within prescribed limits.

Therefore, the dredging and water quality regulations of the SMA and the Navy's permit apply to the Navy's construction of the Everett homeport, regardless of whether that activity occurs on federal or non-federal lands.

The Navy's argument that the SMA's regulation of water quality and dredging are merely duplicative of the Navy's 404 permit and the WDOE's 401 certification is without merit. In *Granite Rock*, the Court stated that because land use regulation and environmental regulation are distinguishable, there is not necessarily duplication when a state statute requires an environmental permit, merely because one is also required by a federal agency. *Id.* at 1431–32.

Moreover, the SMA permit is not duplicative. It imposes several conditions not found in the state's 401 certification or the 404 permit, including controls on debris,

regulation of dredging activities, and requirements to monitor the dredge spoils.

In conclusion, the SMA permit is "required" under the NDAA.

b. *The Permit Has Not Been Issued*

The Navy argues that the SMA permit has been issued. The city of Everett approved, with conditions, the Navy's shoreline permit application. The WDOE then reviewed and approved the permit, imposing some additional conditions. The WDOE's approval constitutes a final order for purposes of either side appealing the decision to the Shorelines Hearings Board. Rev.Wash.Code § 90.58.180.

 However, the permit has not been "issued" for purposes of commencing construction pursuant to it. As required by the SMA, the permit expressly states that construction pursuant to it may not begin and "is not authorized" until all review proceedings have terminated. This stay extends through the term of the appeal to the Shorelines Hearings Board, but may be lifted by a court asked to review the Board's decision. Wash.Rev.Code § 90.58.140(5). Thus, under Washington law the permit does not allow construction to begin while it is being appealed to the Board. This is consistent with Congress' stated purpose in prohibiting the expenditure of funds for the Everett homeport until all dredging permits are obtained: to ensure that environmental concerns are considered prior to construction.

In summary, the district court abused its discretion by denying the plaintiffs' motion for permanent injunctive relief when it found the plaintiffs had not demonstrated irreparable harm. Under the NDAA and the CWA, the Navy must comply with Washington's SMA, including obtaining a shoreline permit. By commencing construction of the homeport before review of that permit is complete, the Navy violated the NDAA and its shoreline permit. The district court erred in not granting the plaintiffs' request for a permanent injunction.

CONCLUSION

We reverse the district court's denial of injunctive relief to the plaintiffs. We order that as of the date of the filing of this opinion, the Navy is permanently enjoined from obligating or expending any funds for the construction of the Everett homeport until a Shoreline Management Act permit has been issued. This permit will not be considered issued until it has been approved after review by the Shorelines Hearings Board.

REVERSED.