871 F.2d 849
 19 Envtl. L. Rep. 20,656
 NATIONAL WILDLIFE FEDERATION; Montana Wildlife Federation;
Northern Plains Resource Council, a Montana
Non-Profit Corporation; Powder River
Basin Resource Council,
Plaintiffs-Appellants,
v.
Robert F. BURFORD, Director, Bureau of Land Management;
James G. Watt, Secretary of the Interior; United
States Department of the Interior,
Defendants-Appellees,
State of Wyoming; Meadowlark Farms, Inc.,
Defendants-Intervenors-Appellees,
and
Shell Oil Company; Western Energy Co., Defendants-Intervenors.
 No. 87-4375.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 9, 1989.
Decided March 30, 1989.
 
 Glenn P. Sugameli (Argued), National Wildlife Federation, Washington, D.C., James A. Patten, Patten Law Firm, Billings, Mont., Eldon V.C. Greenberg, Galloway & Greenberg, of counsel, Washington, D.C., for plaintiffs-appellants.
 Steven P. Quarles, Thomas R. Lundquist, Crowell & Moring, Washington, D.C., for defendant-intervenor-appellee State of Wyo.
 Roger J. Marzulla, Asst. Atty. Gen., Byron H. Dunbar, U.S. Atty., Butte, Mont., Robert L. Klarquist, Atty., Dept. of Justice, Washington, D.C., for the federal defendants-appellees.
 Urban L. Roth, James A. Poore III, Gary L. Walton, Butte, Mont., for defendant-intervenor Western Energy Co.
 Christopher Lane, Harold G. Morris, Jr., Sherman & Howard, Denver, Colo., David J. Ham, Indianapolis, Ind., for defendant-intervenor-appellee Meadowlark Farms, Inc.
 E. Edward Bruce, Eugene D. Gulland, Richard H. Seamon, Covington & Burling, Washington, D.C., R.H. Bellingham, Moulton, Bellingham, Longo & Mather, Billings, Mont., of counsel, for defendant-intervenor Shell Oil Co.
 Appeal from the United States District Court for the District of Montana.
 Before HUG, NORRIS and THOMPSON, Circuit Judges.
 HUG, Circuit Judge:
 
 
 1
 The National Wildlife Federation ("NWF"), Montana Wildlife Federation, Northern Plains Resource Council, and the Powder River Basin Resource Council appeal the district court's entry of summary judgment on count 1 of their amended complaint. Count 1 alleged that the Secretary of the Interior violated 30 U.S.C. Sec. 201(a)(1) (1982) by accepting coal lease bids that fell below fair market value ("FMV").[1] The district court properly held that NWF had standing to bring its suit and properly concluded that the Secretary had acted within the law in selling the leases. We affirm the summary judgment.
 
 
 2
 In 1982, NWF initiated this action challenging the Department of Interior's ("DOI") sale of coal leases in the Powder River Basin area of Montana and Wyoming. The sale involved approximately 1.6 billion tons of coal distributed over 23,000 acres of public land. NWF alleged a variety of federal statutory violations surrounding the sale and sued under the Administrative Procedure Act ("APA"), 5 U.S.C. Secs. 551-706 (1982). Section 702 of the APA allows judicial review of agency action to be initiated by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute...." 5 U.S.C. Sec. 702 (1982). Section 706(2)(A) of the APA allows a reviewing court to set aside an agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. Sec. 706(2)(A) (1982).
 
 
 3
 In September, 1985, 677 F.Supp. 1445, the district judge entered summary judgment for defendants on two counts and dismissed a third count of the amended complaint's five counts. He retained count 1, the fair market value claim, and count 2, a land-use planning claim; he also denied the federal defendants' motion to dismiss count 1 for lack of standing on NWF's part. Thereafter, the district court entered summary judgment on the remaining counts in favor of defendants. NWF appeals only the count 1 ruling.
 
 STANDING
 
 4
 The government and one intervenor, Western Energy, challenge the district court's finding that NWF has standing to attack the coal leasing transactions. We review de novo the district court's holding on the standing issue. American Postal Workers Union v. United States Postal Serv., 861 F.2d 211, 213 (9th Cir.1988) (per curiam).
 
 
 5
 As the Supreme Court has noted, case law has not defined standing with complete consistency. Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 475, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982). A leading commentator has remarked that "such a word as 'irrational' would be strictly accurate" to describe the development of standing law since 1970. K. Davis, Administrative Law Treatise, Sec. 22.00, at 326 (Supp.1982).
 
 
 6
 Despite these dark reflections on the state of the law concerning standing, a few well-established principles exist to guide our analysis. The question of whether the plaintiff has standing involves measuring the plaintiff's claim against certain constitutional and prudential limitations on access to federal court. McMichael v. County of Napa, 709 F.2d 1268, 1269 (9th Cir.1983). The constitutional limitations, deriving from article III's case or controversy requirement, are three in number. The plaintiff must show (1) an actual threatened injury (2) traceable to the defendant's allegedly illegal conduct (3) which is likely to be redressed by the requested relief. Valley Forge, 454 U.S. at 472, 102 S.Ct. at 758; Alaska Fish & Wildlife Fed. v. Dunkle, 829 F.2d 933, 937 (9th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1290, 99 L.Ed.2d 501 (1988); Fair v. EPA, 795 F.2d 851, 853 (9th Cir.1986). The actual or threatened injury may be aesthetic or recreational as well as economic. See Japan Whaling Ass'n v. American Cetacean Soc'y, 478 U.S. 221, 230-31 n. 4, 106 S.Ct. 2860, 2866-67, 92 L.Ed.2d 166 (1986); Sierra Club v. Morton, 405 U.S. 727, 734, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972); Alaska Fish, 829 F.2d at 937. The injury cannot be a general or amorphous harm but must be particular, distinct and concrete. See Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).
 
 
 7
 Since NWF has brought suit under the APA, it must meet two prudential limitations closely related to the article III tests. First, plaintiff needs to establish that agency action caused its injury, Rapid Transit Advocates v. S. Cal. Rapid Transit Dist., 752 F.2d 373, 378 (9th Cir.1985) (per curiam), and, second, that the alleged injury falls within the zone of interest protected by the statute at issue, id.; see also Friends of the Earth v. United States Navy, 841 F.2d 927, 932 (9th Cir.1988); Fair, 795 F.2d at 854. As the Supreme Court recently explained, the zone of interest test is "not meant to be particularly demanding." Clarke v. Securities Indus. Ass'n, 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987). The test is used simply to determine whether the plaintiff's interests more than marginally relate to the purpose implicit in the statute at issue. Id. To determine the statute's purpose, the court may look beyond the section sued under to the statute or act as a whole "to understand Congress' overall purposes." Id. at 401, 107 S.Ct. at 758. See also Friends of the Earth, 841 F.2d at 932, and Fair, 795 F.2d at 854 (relying on legislative history to determine a statute's zone of interest).
 
 
 8
 Finally, the statute at issue will preclude standing if it expresses a "fairly discernible" congressional intent to forestall a suit at the plaintiff's behest. Clarke, 479 U.S. at 403, 107 S.Ct. at 759; National Coal Ass'n. v. Hodel, 825 F.2d 523, 527 (D.C.Cir.1987). Although the plaintiff may fall within a statute's zone of interest, judicial review will not occur if the statute suggests that Congress intended to allow only a specific class of plaintiff to challenge an agency's action. Clarke, 479 U.S. at 399, 107 S.Ct. at 757 (citing Block v. Community Nutrition Inst., 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984)).
 
 
 9
 Two other standing components apply to this case. First, as a general rule, "an organization whose members are injured may represent those members in a proceeding for judicial review." Sierra Club v. Morton, 405 U.S. at 739, 92 S.Ct. at 1368. More specifically, an association has standing on behalf of its members when (a) its members have standing in their own right; (b) the interests the association seeks to protect are germane to the organization's interests; and (c) the asserted claim or requested relief do not entail the need for individual members to participate. Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); Alaska Fish, 829 F.2d at 937-38. Second, standing is not dependent, of course, on the merits of the plaintiff's claim that particular conduct is illegal. McMichael, 709 F.2d at 1271 (quoting Warth v. Seldin, 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)).
 
 
 10
 We conclude that NWF has standing to sue under these principles. The touchstone of NWF's standing lies in its assertion of injuries as a result of the DOI's actions.
 
 
 11
 Plaintiffs represent themselves and their individual and organizational members. Plaintiffs and their members actively use the environmental resources of the Powder River Basin for fishing, hunting, bird and wildlife watching, and other recreational activities. These persons will be irreparably injured in their use and enjoyment of these resources if defendants are permitted to conduct the scheduled coal lease sale without fully complying with applicable laws. Individuals affiliated with plaintiffs live, own property, ranch, farm, and earn their livelihoods from lands within the Powder River Basin area. These persons will be irreparably injured in the enjoyment of their property, and in their businesses and livelihoods, if defendants are permitted to conduct the scheduled coal lease sale without fully complying with applicable laws.
 
 
 12
 Plaintiffs' Amended Complaint at 3-4. NWF claims, in other words, significant particularized harm to its members' esthetic, recreational, and economic interests as a result of DOI's actions.
 
 
 13
 These alleged harms are sufficient to satisfy the injury and traceability requirements necessary to establish standing. As the district court concluded, NWF may have suffered an economic injury in that the sale of the leases at less than FMV would reduce the amount available to the state under section 191 of the Mineral Leasing Act for the amelioration of coal productions's social and economic impact.[2] As the district court also found, NWF's aesthetic and recreational interests may have suffered in that below-FMV pricing of the leases could have promoted added development that higher lease costs might have discouraged.
 
 
 14
 These economic and environmental injuries fall within the zone of interests Congress intended the statute to protect. As this court recently noted, the basic purpose of the FCLAA is
 
 
 15
 "to provide for a more orderly procedure for the leasing and development" of coal the United States owns, while ensuring its development "in a manner compatible with the public interest." ... Congress's underlying substantive policy concern was to develop the coal resources in an environmentally sound manner. This purpose lays as much stress on the developing [of] the coal resources as it does on the environmental effects of development.
 
 
 16
 Northern Cheyenne Tribe v. Hodel, 851 F.2d 1152, 1156 (9th Cir.1988) (citation omitted). The Mineral Leasing Act itself, when read as a whole, see Clarke, 479 U.S. at 401, 107 S.Ct. at 758, shows that Congress had a clear concern for protecting social, economic, and environmental interests from damage related to mineral production. See, e.g., 30 U.S.C. Sec. 191 (Supp. I 1983) (funding to mitigate social and environmental impact); id. Sec. 201(a)(3)(C) (1982) (Secretary must consider economic and environmental impact of coal mining); id. Sec. 201(a)(3)(E) (1982) (coal leases must contain provisions requiring compliance with Federal Clean Air Act and Water Pollution Control Act); id. Sec. 241(e)(1) (1982) (Secretary to consult with state officials to minimize social, economic, and environmental impact of oil shale developments). NWF's alleged injuries clearly fall within the zone of interests covered by the statute.
 
 
 17
 The government presents three challenges to the conclusion that NWF has standing to pursue this suit. The government contends that the probability of the state expending section 191 funds in a way that would address NWF's concerns is so remote as to undermine standing. This argument is unpersuasive. Given section 191's revenue sharing and state spending provisions, and the fact that NWF alleges not only environmental but also social and economic injury, it is more likely than not that NWF members would witness some expenditure of lease sale money in their locales. The central question here is not how much they are likely to receive but rather how much they have lost as a result of possible below-FMV sales.
 
 
 18
 Next, the government contends that NWF's environmental complaints may be sufficient to establish standing under some parts of the FCLAA but not under section 201(a)(1). This claim is also unpersuasive. As Clarke suggests, the fitting of a plaintiff's injuries to the zone of interest test to the concerns Congress intended the statute to address takes place in regard to the statute as a totality. Northern Cheyenne's conclusion that the FCLAA intertwined strands of environmental with economic concerns into a unified whole defeats the government's excessively narrow interpretation of the statute. NWF can establish standing by relying on the statute as a whole.
 
 
 19
 Finally, the government maintains that the statute intends the states, and not their citizens, to police the Secretary's behavior under section 201(a)(1). This argument appears to draw on Community Nutrition Institute's "fairly discernible" intent test. In Community Nutrition Institute, the Supreme Court held that the Agricultural Marketing Agreement Act of 1937 precluded a consumer challenge under the APA to orders setting milk prices. 467 U.S. at 340, 104 S.Ct. at 2451. The Court relied heavily on the fact that the Act specified judicial review specifically for milk handlers and made no provision for consumer participation in the judicial review section or in any proceeding under the Act. Id. at 345-53, 104 S.Ct. at 2453-54. The FCLAA differs considerably from the Marketing Act. First, it does not specify by name the class of plaintiffs who may raise a challenge under its terms. It is, in fact, silent on the judicial review issue. Second, it provides for public participation in its lease sale and land use planning sections. See 30 U.S.C. Secs. 201(a)(1) & 201(a)(3)(A)(ii) (1982). The government's claim, consequently, does not offer "indications of the kind presented in Community Nutrition Institute that make 'fairly discernible' a congressional intent to preclude review" at NWF's behest. Clarke, 479 U.S. at 403, 107 S.Ct. at 759.
 
 
 20
 Western Energy offers its own challenges to NWF's standing. Western argues that NWF lacks standing because it has not established for each individual lease a clear injury and because it seeks redress unlikely to be achieved under the requested relief. These claims are unpersuasive. Western essentially asks that NWF prove with certainty that it has suffered a significant loss under section 191 for each lease tract. This demand far exceeds the showing necessary to establish injury. Plaintiff need only demonstrate the threats or potential of injury; the injury itself need be nothing more than a trifle. See United States v. SCRAP, 412 U.S. 669, 689 & n. 14, 93 S.Ct. 2405, 2417 fn. 14, 37 L.Ed.2d 254 (1973). Western's argument comes very close to insisting that NWF prove the merits of its case in the course of establishing standing.
 
 
 21
 The relief claim misapprehends NWF's position. While Western argues that NWF wants to reduce the number of coal leases in the Powder River area, NWF expressly asks only that the leases be voided. Voiding the leases would directly redress the injuries asserted by NWF in that the leases may eventually be resold at a higher price, thereby potentially raising the amount of section 191 revenue expended in the Powder River area and possibly mitigating social and environmental damage.
 
 
 22
 As a final note, NWF has satisfied the requirements for organizational standing under Hunt, 432 U.S. at 343, 97 S.Ct. at 2441. First, NWF's members live and work in, and use for recreation the resources of, the Powder River Basin, and risk the loss of mitigating funding if the leases were sold at less than FMV. Second, ameliorating the impact of coal production is germane to the NWF's purpose of protecting the environmental, social, and economic qualities of affected areas. See Statement of Parties, Plaintiffs' Amended Complaint at 2-3. Finally, because NWF is not seeking monetary damages, its members need not participate directly in the litigation. See Alaska Fish, 829 F.2d at 938.
 
 
 23
 The district court correctly held that NWF has alleged a particular set of injuries arguably within the FCLAA's zone of interest. The likelihood of redress through the requested relief is substantial. NWF has standing to present its case.
 
 MERITS
 A. Standard of Review
 
 24
 We review the summary judgment grant de novo. Marathon Oil Co. v. United States, 807 F.2d 759, 765 (9th Cir.1986), cert. denied, 480 U.S. 940, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987). We will affirm summary judgment "if, after reviewing the record in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Id.
 
 
 25
 We approach the Secretary's leasing decision, however, with substantially greater deference. Because the challenged action amounts to an informal agency decision that falls neither under the APA's rule-making provisions, 5 U.S.C. Sec. 553 (1982), nor under its public adjudication provisions, 5 U.S.C. Secs. 556, 557 (1982), we apply the arbitrary, capricious or abuse of discretion review standard of 5 U.S.C. Sec. 706(2)(A). See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 413-14, 91 S.Ct. 814, 822-23, 28 L.Ed.2d 136 (1971); Marathon Oil, 807 F.2d at 765.
 
 
 26
 As the Supreme Court has frequently stressed, this type of review is very narrow and highly deferential to the agency. See, e.g., Overton Park, 401 U.S. at 416, 91 S.Ct. at 823 ("Although ... inquiry ... is to be searching and careful, the [arbitrary or capricious] standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."). Deference is especially due when Congress has explicitly delegated authority to the agency "to elucidate a specific provision of the statute." Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 843-44, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984).
 
 
 27
 In reviewing the agency decision to determine whether it was arbitrary or capricious, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Overton Park, 401 U.S. at 416, 91 S.Ct. at 823. The court looks for "a 'rational connection between the facts found and the choice made.' " Motor Vehicle, 463 U.S. at 43, 103 S.Ct. at 2866 (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962)). The action, however, need be only a reasonable, not the best or most reasonable, decision. See Wilderness Public Rights Fund v. Kleppe, 608 F.2d 1250, 1254 (9th Cir.1979), cert. denied, 446 U.S. 982, 100 S.Ct. 2962, 64 L.Ed.2d 838 (1980). Finally, a shift from settled policy requires a showing of reasoned analysis. Motor Vehicle, 463 U.S. at 41-42, 103 S.Ct. at 2865-66; Bob's Big Boy Family Restaurants v. N.L.R.B., 625 F.2d 850, 852 (9th Cir.1980).
 
 
 28
 The reviewing court considers the reasonableness of an action not from an entirely fresh perspective but on the basis of the administrative record in existence at the time of the decision to act. Camp v. Pitts, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam). "If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985).B. Discussion
 
 
 29
 As noted above, 30 U.S.C. Sec. 201(a)(1) (1982) provides that no bid on land offered for leasing "shall be accepted which is less than the fair market value, as determined by the Secretary, of the coal subject to the lease" (emphasis added). The Secretary "shall award leases ... by competitive bidding." Id. Defined in 43 C.F.R. Sec. 3400.0-5(n) (1981), fair market value is "that amount in cash, or on terms reasonably equivalent to cash, for which in all probability the coal deposit would be sold or leased by a knowledgeable owner willing but not obligated to sell or lease to a knowledgeable purchaser who desires but is not obligated to buy or lease."
 
 
 30
 In light of the language contained in section 201(a)(1) and the interpretative regulation, NWF's task is to show that DOI did not receive FMV for its leases in the Powder River Basin area. Since agency action is presumed to be justified, Wilderness Public Rights, 608 F.2d at 1254, and the Secretary need present only a reasonable explanation for his actions, NWF's burden of proof is considerable.
 
 
 31
 The district court, after a careful review of the administrative record, concluded that the Secretary acted reasonably, although possibly not supremely wisely, in accepting the Powder River lease bids. He found specifically that the shift to an entry level bid ("ELB") system which allowed lower initial bids than the prior minimum acceptable bid ("MAB") system, was satisfactorily explained in the record by information attesting to declining coal prices; that FMV refers to receipt of a fair return, and not to the procedures used (citing California v. Watt, 712 F.2d 584, 606 (D.C.Cir.1983)); that nine of the eleven tracts up for lease received high bids that met or exceeded the pre-sale estimates of FMV[3]; and that the process used to calculate the pre-sale FMV figures, which involved approximately 4,000 hours of work, was not unsound.
 
 
 32
 NWF raises two major attacks on the district court's finding of reasonableness. First, it contends that the shift to the ELB system was irrational and insufficiently explained in the record. The ELB procedure guaranteed, according to NWF, the receipt of less than FMV. Second, NWF argues that the MABs used in the sales were skewed by the DOI's reliance on a prior coal lease sale not comparable to the Powder River Basin sale. Use of these MABs as benchmarks of FMV, consequently, was improper.
 
 
 33
 The claim based on deficiencies in the ELB system is unpersuasive. First, the ELB system is not in itself arbitrary or capricious. The basis for the bidding procedure, as NWF repeatedly points out, is the presumption of competitive bidding. As section 201(a)(1) makes clear, leases shall be sold by the Secretary "by competitive bidding." The Secretary contends the ELB system stimulates competitive bidding. The Secretary can hardly be faulted for using a sales system whose purpose is to implement the statute's mandate. Second, the shift from the MAB to ELB procedure did not constitute an abrupt or unexplained departure from settled policy. As the administrative record shows, DOI had begun to consider use of the ELB system in coal lease sales in 1981. The decision to implement this system in the Powder River lease sale occurred as a result of studies suggesting a decline in the western coal market. The use of the ELB to stimulate competitive bidding at the time of a softening market cannot be said to be arbitrary and capricious. Finally, despite whatever flaws may have existed in the ELB system, actual high bids on nine out of the eleven available tracts met or exceeded the pre-sale estimate of FMV. It is the result of the bidding procedure that is important: whether the high bid represented fair market value.
 
 
 34
 NWF's second contention is that the MABs used in the pre-sale estimates were defective, and did not represent fair market value. NWF claims that in calculating pre-sale FMV, DOI used data from one prior sale, the "AB" sale, that was not comparable while ignoring data from a comparable sale, the "CD" sale. Choice of comparable sales figures and the calculation of MABs is a technical issue subject to analysis by trained specialists. The reviewing court's task is not to resolve disagreements between differing technical perspectives. Instead, its duty "is the limited one of ascertaining that the choices made by the [Secretary] were reasonable and supported by the record.... That the evidence in the record may support other conclusions, even those that are inconsistent with the [Secretary's], does not prevent us from concluding that his decisions were rational and supported by the record." Lead Indus. Ass'n, Inc. v. EPA, 647 F.2d 1130, 1160 (D.C.Cir.), cert. denied, 449 U.S. 1042, 101 S.Ct. 621, 66 L.Ed.2d 503 (1980). The administrative record suggests that the Economic Evaluation Committee's appraisal of the AB sales led to the conclusion that the AB figures best suited the type of leases available in the Powder River Basin. DOI had a reasonable basis for its Powder River MABs and for its conclusion that the lease price for the tracts which equaled or exceeded the pre-sale MABs represented fair market value.
 
 
 35
 Finally, NWF contends that a variety of procedural irregularities corrupted the bid process. NWF states that pre-bid pricing leaks to industry representatives, the Secretary's quick announcement that the sale was successful, and other events of a similar nature irretrievably corrupted the sale. Although these irregularities may have occurred, NWF has not met its burden of showing that the leases did not sell for a fair return as a result of these problems. Given that the pre-sale FMV figures were reasonable and that nine out of the ten leases went to bidders who met or exceeded those figures, NWF's procedural argument is unpersuasive.
 
 CONCLUSION
 
 36
 NWF has not demonstrated that DOI received less than FMV for its Powder River leases and that the Secretary's decision to accept the leases was arbitrary or capricious. The district court's summary judgment ruling, consequently, is AFFIRMED.
 
 
 
 [1]
 Section 201(a)(1), part of the Federal Coal Leasing Amendments Act of 1976 ("FCLAA"), amending the Mineral Leasing Act of 1920, states in relevant part: "No bid shall be accepted which is less than the fair market value, as determined by the Secretary, of the coal subject to the lease."
 
 
 [2]
 Section 191 provides that 50% of the proceeds collected from sale of federal mineral leases shall be returned to the state in which the leased property stands for use, among other projects, in areas "socially or economically impacted by development of minerals leased under this chapter...." 30 U.S.C. Sec. 191 (Supp. I 1983)
 
 
 [3]
 The Secretary accepted bids on ten of the eleven tracts. One bid was rejected. The single accepted bid that fell below the pre-sale FMV estimate involved the Little Rawhide Creek tract. The Secretary accepted this bid on the grounds that the Little Rawhide Creek tract constituted a potential bypass tract. A bypass tract consists of "an isolated coal deposit that cannot ... be mined economically and in an environmentally sound manner either separately or as part of any logical mining unit other than that of the applicant." 43 C.F.R. Sec. 3400.0-5(d) (1981). This type of tract appeals, in other words, only to a single bidder who owns an adjacent tract. The one bidder on the Little Rawhide Creek tract, Meadowlark Farms, Inc., owns the land to the north and east of the tract. The Secretary determined that, even if adjacent unleased federal coal were included with the tract, the Little Rawhide Creek tract could not, standing alone, offer the possibility of a profitable return to a potential buyer. In light of this fact, and the fact that NWF has not shown that any mining unit other than Meadowlark Farms could economically mine the tract, the Secretary reasonably decided to accept the tendered bid as a special circumstance