The BAYS' LEGAL FUND,
et al., Plaintiffs,

v.

Carol BROWNER, Administrator of the U.S. Environmental Protection Agency, et al., Defendants.

GREENWORLD, INC. and Richard Strahan, Plaintiffs,

v.

Ronald BROWN, Secretary of the U.S. Department of Commerce, et al., Defendants.

Civ. A. Nos. 93–10883–MA, 93–10623–MA.

United States District Court,
D. Massachusetts.

July 23, 1993.

Eric R. Glitzenstein, Katherine A. Meyer, Meyer & Glitzenstein, Washington, DC, Richard G. Barry, Hyannis, MA, for plaintiffs.

George B. Henderson, II, George B. Henderson, U.S. Atty's Office, Boston, MA, Elinor Colburn, Dept. of Justice, Washington, DC, Douglas Wilkins, Office of Atty. Gen., Crim. Bureau, Mary C. Connaughton, Atty. General's Office, Boston, MA, for defendants.

Theodore Smayda, amicus, pro se.

Charles A. Mayo, III, Sr., amicus, pro se.

## OPINION

MAZZONE, District Judge.

■ The plaintiffs, Bays' Legal Fund and Greenworld, Inc.,[1] requested that this Court issue a preliminary injunction ordering the defendants, Carol Browner, Secretary of the U.S. Environmental Protection Agency, and Ronald Brown, Secretary of the U.S. Department of Commerce,[2] to take the necessary actions to discontinue construction of a mu-

---

1. A full list of the plaintiffs also includes Richard Strahan, joining Greenworld, Inc., and Stop the Outfall Pipe, Dolphin Fleet of Provincetown, International Wildlife Coalition, The Fund for Animals, Inc., and Nancy Church, joining Bays' Legal Fund.

2. The full list of defendants also includes Paul Keough, Regional Director (Region One) of the U.S. Environmental Protection Agency, William Fox, Acting Assistant Administrator of the National Marine Fisheries Service, Richard Roe,

Regional Director of the National Marine Fisheries Service, Daniel Greenbaum, Commissioner of the Massachusetts Department of Environmental Protection, Lieutenant General Arthur E. Williams, Director of the U.S. Army Corps of Engineers, Colonel Brink P. Miller, Regional Director (New England) of the U.S. Army Corps of Engineers, and Douglas MacDonald, Executive Director of the Massachusetts Water Resources Authority.

nicipal sewerage discharge tunnel. The plaintiffs' request was based on allegations that the defendants had violated federal environmental laws and regulations designed to protect endangered species in the Massachusetts and Cape Cod bays and throughout the nation. Because the record in this case is essentially complete, this Court, pursuant to Fed.R.Civ.P. 65(a)(2), hereby consolidates the plaintiffs' motions for preliminary injunction with a formal review of the merits of the plaintiffs' claims.[3]

The importance of this litigation and our nation's laws to protect endangered species cannot be overstated. As Congress has stated on the significance of endangered species legislation:

> From the most narrow possible point of view, it is in the best interests of mankind to minimize the losses of genetic variations. The reason is simple: they are potential resources. They are keys to puzzles which we cannot solve, and may provide answers to questions which we have not yet learned to ask.

Report of the House Committee on Merchant Marine and Fisheries, H.R.Rep. No. 93–412, pp. 4–5 (1973). I begin by setting forth the factual background of this case.

### I. Factual Summary

In 1985, the United States and the Conservation Law Foundation sued the Metropolitan District Commission. *See United States v. Metropolitan District Commission, et al.,* (Civil Action No. 85–0489–MA) and *Conservation Law Foundation v. Metropolitan District Commission, et al.,* (Civil Action No. 83–1614–MA). As a result of this litigation, this Court ordered the Metropolitan District Commission to limit the dumping of raw sewerage into Boston Harbor and to bring it, as well as the Massachusetts and Cape Cod bays ("the bays"), into compliance with the standards of the Clean Water Act, 33 U.S.C. § 1251, *et seq.* (1988).

Since then, the defendants have been engaged in the cleanup of these waters. To that end, they have been permitting, designing, funding, constructing and operating the necessary treatment facilities. A central component of the cleanup strategy is the construction of an outfall tunnel, which, when operational, will carry treated effluent nine miles out to sea, through the ocean floor. At its mouth, diffusers will discharge the treated effluent into the bays.

Inhabiting these bay waters are a number of endangered species, including the right whale, humpback whale, fin whale, sei whale and blue whale, and the Kemp's ridley turtle, leatherback turtle and hawksbill turtle. Environmental Protection Agency, *Assessment of Potential Impact of the MWRA Outfall on Endangered Species: Executive Summary,* at ES–4 (April 23, 1993) [hereinafter 1993 BA].[4] Section 7(a)(2) of the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.* (1988) ("ESA"), requires that each federal agency enter into consultation with the Department of Commerce to "insure that any action authorized, funded, or carried out by such

---

3. The issue of advancing trial and consolidating it with the preliminary injunction hearing was first raised by The Bays' Legal Fund in its papers. Motion to File Reply Memorandum at 2. After consulting with the defendants at the July 2, 1993 hearing and seeking their written views on the plaintiffs' request, I now allow consolidation for the following reasons. First, the record is complete and ripe for review. Second, this Court sees no reason for delay, since the evidence reasonably admits of only one outcome. Third, a decision on the merits now does not necessarily shut off the debate. As the Commonwealth of Massachusetts ("the Commonwealth") and the Massachusetts Water Resources Authority ("MWRA") point out, the National Marine Fisheries Service ("NMFS") is scheduled to issue its biological opinion in two months, addressing the ecological impact of the tunnel project. *See* Letter to Court of July 8, 1993. If the NMFS

biological opinion raises some question or differs with the environmental position taken by the defendants, the issues can be reactivated and readdressed in light of whatever contribution is made by the NMFS opinion.

4. These species have been "listed" as endangered pursuant to the Endangered Species Act, and are sometimes referred to in this Order as "the listed species." Of these species, the EPA has focused its research attention on the right, humpback and fin whales and the Kemp's ridley, leatherback and loggerhead turtles, because they are frequently observed in inshore waters, including the area of the proposed outfall. 1993 BA, at ES–4. In addition to the listed species, there are two threatened species in the bays—the loggerhead and green turtles. *Id.*

agency ... is not likely to jeopardize the continued existence of any endangered species ... or result in the destruction or adverse modification of habitat of such species."[5] 16 U.S.C. § 1536(a)(2). In May, 1986, the Environmental Protection Agency ("EPA") initiated this consultation with the NMFS, requesting information concerning the presence of endangered species in the proposed project area. Discussions with the NMFS also addressed the possible impact on endangered species that the sewerage treatment project, including the outfall tunnel, might have. In a one-page letter, dated February 16, 1988, the NMFS responded to the EPA that endangered species were within the project area, but gave its "tentative conclusion" that the sewerage treatment project "will not significantly affect" endangered species in the bays.[6] NMFS Letter to EPA (Greenworld, Inc. Complaint, Ex. F).

Section 7(c) of the ESA requires that each federal agency involved in the agency action "conduct a biological assessment for the purpose of identifying any endangered species which is likely to be affected by [that] action." 16 U.S.C. § 1536(c). Accordingly, in 1988, pursuant to the requirements of the ESA, the EPA completed a biological assessment of the Boston Harbor cleanup project, known as the Supplemental Environmental Impact Statement ("SEIS").[7] The aim of the study was to determine, in part, what effect the project would have on marine species in the bays, including endangered species. United States Mem. at 4. *See also*, Draft Supplemental Environmental Impact Statement ("DSEIS") (completed April 1, 1988); Final Draft Supplemental Environmental Impact Statement ("FSEIS") (completed July 31, 1988). Because the areas affected by the outfall were determined to be so distant from the areas inhabited by the listed species, the EPA concluded that the listed species would not suffer any adverse impact from the wastewater treatment proposal.[8] United States Mem. at 4.

In July, 1990, the MWRA, the state agency responsible for overseeing the implementation of the new sewerage treatment system, awarded contracts for the construction of the outfall tunnel. *United States v. Metropolitan District Commission*, MWRA Monthly Compliance Report For July 1990 and Progress Report as of August 15, 1990 (Fed. Def.Ex. 4), at 4. At that time, the MWRA gave notice to proceed with the construction of the drop shaft, but withheld a general notice to proceed with all phases of construction of the outfall tunnel until the necessary permits were obtained. *Id.*, at 4 n. 2. After reviewing the permit application submitted by the MWRA, the Army Corps of Engineers ("ACOE") approved the requested National Pollution Discharge Elimination System ("NPDES") permit, allowing the MWRA to proceed with the construction of the outfall tunnel and diffusers. *Id.* In the Record of Decision accompanying the permit, the ACOE stated that the EPA had already adequately addressed the significant environ-

5. The NMFS is the division of the Department of Commerce which enters into consultation with federal agencies on action affecting marine life. If the action affected land-based animals, then consultation would be required with the Department of Interior, and within that Department, the United States Department of Fish & Wildlife. *See* 16 U.S.C. § 1536(a)(2) (requiring consultation with Department of Interior).

6. The NMFS's conclusion was based on the lack of opportunistic sightings of endangered species in the vicinity of the proposed outfall tunnel and on the fact that "the potential effects from secondary treated wastewater will be less then [sic] primary treatment wastewater." NMFS Letter to EPA (Greenworld, Inc. Complaint, Ex. F).

7. Section 7(a)(2) of the ESA requires that "the best scientific and commercial data available" be used by agencies studying whether proposed action is likely to have a significant, adverse impact on endangered species. 16 U.S.C. § 1536(a)(2). The plaintiffs complain that the EPA's analysis failed to meet that standard. Yet the plaintiffs never produce any evidence that the data on which the EPA relied to prepare its biological studies was inferior in any way. They only make the conclusory allegation that another governmental research body, the U.S. Marine Mammal Commission, could have performed the study with greater expertise. *See* Greenworld Mem. at 10 & n. 8. I find that there is no basis for concluding at this time that the EPA violated § 7(a)(2) in terms of the quality of data it employed.

8. According to the United States, the critical habitat of the right whale is over 17 miles southeast from the outfall site. United States Mem. at 5 n. 2.

mental issues surrounding the construction and use of the outfall tunnel and that, therefore, it was adopting the EPA's SEIS rather than conduct its own environmental review of the proposed outfall system. *Id.,* at 7. In approximately March, 1991, the MWRA issued a notice to proceed with construction of the outfall tunnel. *Id.*

On September 13, 1991, the MWRA filed with the EPA an application to renew its NPDES permit to discharge wastewater into the Boston Harbor. At that time, the EPA concluded that another biological assessment and consultation with the NMFS was warranted, given the growing public concern over the potential impact of the tunnel project on endangered species, the significance of the project, and the availability of new information accumulated since completion of the 1988 SEIS. On April 26, 1993, the EPA completed its second biological assessment of the outfall system and its potential impact on endangered species—the 1993 BA—and initiated formal consultation with the NMFS pursuant to § 7(a)(2) of the ESA. In the 1993 BA, the EPA again concluded that the discharge from the outfall tunnel is not likely to cause an adverse impact to endangered species. Pursuant to § 7(b), the NMFS is presently preparing its own biological opinion on the environmental impact of the outfall system to endangered species in the bays. According to the United States, the NMFS expects to issue its opinion by September 8, 1993.[9]

## II. *Judicial Review*

■ Before proceeding to the substantive issues of law, the appropriate standard of review should be addressed. Where the action to be reviewed is informal adjudica-

tion, as it was here, the proper standard of review is whether the administrative decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1988); *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). *See Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 981–982 (9th Cir.1985) (standard of review for administrative actions involving the ESA is arbitrary and capricious standard). Under this standard, the reviewing court must uphold the administrative action if the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Friends of Endangered Species,* 760 F.2d at 982 (citing *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 105, 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983)). Also, where there is a factual dispute involving issues of science, which implicates substantial agency expertise, deference is owed to the informed decisionmaking of the responsible agency.[10] *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 376–77, 109 S.Ct. 1851, 1860–61, 104 L.Ed.2d 377 (1989). *See Baltimore Gas & Electric Co.,* 462 U.S. at 103, 103 S.Ct. at 2255 ("When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential."). Therefore, to succeed, the plaintiffs must establish that the defendants' decisions, especially the scientific determinations by the EPA and the ACOE regarding the effect of the outfall tunnel on endangered species, were arbitrary and capricious. With this standard of review in mind, I turn to the substantive legal issues at stake here.[11]

---

9. This summary draws on undisputed factual assertions by the United States. *See* United States Mem. at 4–9.

10. In reviewing the briefs and attached exhibits, I have also kept in mind that the scope of my review must be confined to the administrative record already in existence, in this case the SEIS and the 1993 BA, and not extend to some new record prepared in anticipation of litigation. *Camp v. Pitts,* 411 U.S. at 142, 93 S.Ct. at 1244; *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 419, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971) ("litigation affidavits ... were merely

'post hoc' rationalizations, which have traditionally been found to be an inadequate basis for review") (citations omitted); *Rodway v. United States Department of Agriculture,* 514 F.2d 809, 816 (D.C.Cir.1975) ("litigation affidavits are an unacceptable basis for appellate review of agency decisionmaking").

11. I am unpersuaded by the defendants' efforts to bar the plaintiffs' claims based on laches. Laches is a disfavored defense in environmental litigation. *Park County Resource Council, Inc. v. United States Dep't of Agriculture,* 817 F.2d 609, 617 (10th Cir.1987) (laches must be invoked'

### III. *Legal Analysis*

■ The plaintiffs seek to stop additional construction of the outfall tunnel, alleging that the defendants have violated the Endangered Species Act, the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* (1988), and the Marine Mammal Protection Act, 16 U.S.C. §§ 1361 *et seq.* (1988).[12]

### A. *The Endangered Species Act*

The plaintiffs allege that the defendants have violated three distinct provisions of the ESA—§§ 7(a)(2), (c) and (d).

#### 1. *Section 7(a)(2)*

Section 7(a)(2) of the ESA requires each federal agency to insure that any action it authorizes is "not likely to jeopardize the continued existence of any endangered species ... or result in the destruction or adverse modification of habitat of such species...." 16 U.S.C. § 1536(a)(2). The plaintiffs argue that the defendants violated this provision of the ESA, contending on several grounds that the construction and use of the outfall tunnel are, in fact, likely to have an adverse impact on endangered species in the bays.[13] The plaintiffs allege that the outfall system will result in increased levels of nutrients and toxics in the bays, which will have an adverse impact on endangered species there. They also allege that the tunnel construction itself might have a serious impact on these endangered species and that the defendants have not studied the potential impact of construction on them.

First, as for the plaintiffs' concern about increased levels of nutrients, the EPA found in its 1993 BA that the discharge of nutrients from the new outfall system is not likely to cause any significant changes to the food chain of the endangered species in the bays. *See* 1993 BA (Ex. BB of Bays' Legal Fund Mem.), ch. 4, at 29, 35. *See generally,* 1993 BA, ch. 4, § 2 (nutrient impact on endangered species). The level of nutrients is expected to remain relatively stable in the bays in the immediate future.[14] *See* 1993 BA, ch. 4, at 20. Any increased levels of nutrients are likely to be concentrated within a "very limited area" around the outfall. *Id.,* at 35. As a result, any impact on phytoplankton and other nutrient sources of the endangered species should be similarly limited. *Id.*

Even those experts with concerns about increased nutrient levels in the bays—Pro-

---

sparingly in environmental cases); *Preservation Coalition, Inc. v. Pierce,* 667 F.2d 851, 854 (9th Cir.1982) (same); *Concerned Citizens on I–190 v. Secretary of Transportation,* 641 F.2d 1, 7–8 (1st Cir.1981) (laches is disfavored defense in environmental cases). As the Ninth Circuit explained in *Preservation Coalition,* laches should be avoided in environmental cases because the plaintiff typically is not the only victim of the purported environmental damage. 667 F.2d at 854. Also, a more welcoming attitude would undermine Congress's environmental objectives. *Id.* And citizens have a right to assume that officials will comply with environmental laws and to rest on that assumption. *Id.* Furthermore, the Endangered Species Act places an overriding premium on protecting listed species. *See TVA v. Hill,* 437 U.S. 153, 174, 98 S.Ct. 2279, 2292, 57 L.Ed.2d 117 ("the language, history, and structure of the [Endangered Species Act] indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities."). Believing that the Ninth Circuit's reasoning is applicable here, I find that the laches defense fails.

12. To be specific, the plaintiffs' suits do not entirely overlap. While Greenworld, Inc. and Richard Strahan have dragged the legal net and alleged violations of all three statutes, the ESA, NEPA and MMPA, the Bays' Legal Fund has focused exclusively on alleged violations of the ESA. For the sake of ease, I refer herein to "the plaintiffs," without drawing distinctions between them.

13. The plaintiffs did not frame their argument in terms of § 7(a)(2), but rather in terms of a motion for preliminary injunction. Whereas § 7(a)(2) requires proof that approval of the outfall tunnel project by the defendants is likely to have an adverse impact on endangered species in the bays, the preliminary injunction standard requires proof that such agency action will cause these animals irreparable harm. For present purposes, I believe that the two standards are sufficiently analogous to treat them equivalently. Therefore, because this case has been consolidated, I treat the plaintiffs' irreparable harm arguments as support for a substituted § 7(a)(2) claim.

14. Discharges of nitrogen and other nutrients from the new outfall system are expected to result in only a "small incremental increase to the baywide system" relative to the amounts that are already introduced in Boston Harbor and exported to the bays. 1993 BA, ch. 4, at 20.

fessor Smayda, Dr. Mayo and Hans Neuhauser—acknowledge that they can only speculate as to the impact additional nutrients might have on endangered species.[15] In their affidavits, Smayda and Mayo express their worry that an increase of nitrogen could fertilize harmful phytoplankton species, which are now present in the bays in "seed stock" concentrations. Smayda Aff., at 2. *See* Mayo Aff., at 7. However, because the phytoplankton demographics around the outfall tunnel are in a state of constant flux, as currents shift, both experts admit that the effect of increased levels of nitrogen around the outfall tunnel is unknown. Smayda Aff., at 6. *See* Mayo Aff., at 5. As Smayda states, the outfall tunnel could be "an attractive nuisance," spurring the growth of unfavorable phytoplankton flora, or "an attractive oasis," nourishing very favorable phytoplankton species. Smayda Aff., at 5. Though these experts urge further research, all three conclude that there is not enough information at this time to know with any degree of certainty what effect the tunnel will have on phytoplankton in the bays. Mayo Aff., at 13 ("[W]e can't be certain of the effects [of the proposed outfall discharges] . . . because we understand the system so little that it's exceedingly difficult to make a positive prediction."); Neuhauser Aff., 5 ("The increase in pollution of these bays by the . . . outfall represents a potential threat to the Right Whale. Due to limited information . . ., the magnitude of the threat can only be estimated, and then, only with a great deal of uncertainty."). *See* Smayda Aff., at 6.

These experts put everyone on notice of potential threats to the food source of endangered species in the bays. If and when there is concrete, scientific evidence that substantiates the likelihood of a threat, it will be appropriate to reconsider the wisdom, not to mention the legality, of the outfall tunnel as a means of effluent discharge. Until then, however, the ESA does not require the cessation of activities because of "concerns" that

some may have. Such a grave response is only required by statute when there is a "likelihood" of an adverse impact to endangered species. *See* 16 U.S.C. § 1536(a), (c). Nothing in the experts' affidavits comes near to meeting that standard. Therefore, I conclude that, at present, there is insufficient evidence to show that the discharge of nutrients from the outfall tunnel will harm endangered species in the bays.

As for the plaintiffs' concern about toxics, it appears from the EPA's recent biological assessment that the listed species are "not likely to be adversely affected" by toxic chemicals eliminated into the bays through the outfall tunnel. 1993 BA, ch. 4, at 85. *See generally* 1993 BA, ch. 4, § 3 (discussing impact of toxic discharges on endangered species). It is predicted that most of the toxic contaminants in the wastewater effluent will be diluted to concentrations below applicable water quality standards within 50 meters of the outfall diffusers (the area of "initial dilution"). 1993 BA, ch. 4, at 66. There are, however, a handful of toxic chemicals that may exceed water quality standards beyond initial dilution. *Id.* Yet the anticipated excesses are small. *Id.*, at 67. Moreover, the background presence of these chemicals in Massachusetts Bay already exceeds extremely conservative water quality criteria. *Id.*, at 67. Therefore, the EPA has concluded that "the small predicted incremental exceedences [sic] from the discharge probably will not cause or contribute to injury of the biological resources, including endangered species and their foods." *Id. See also,* 1993 BA, ch. 4, at 85 (finding that endangered species in Massachusetts Bay not likely to be adversely affected by chemicals discharged from outfall tunnel).[16]

The plaintiffs allege that the ongoing tunnel construction may also threaten the survival of the listed species in the bays. Bays' Legal Fund Mem. at 25–26; Greenworld

---

**15.** Professor Smayda and Dr. Mayo submit their affidavits on behalf of *amici curiae.* Hans Neuhauser submits his affidavit on behalf of Greenworld, Inc.

**16.** Though the findings of the EPA indicate that the effect of the outfall tunnel on levels of nu-

trients and toxics is not likely to jeopardize the well-being of endangered species in the bays, it is important to note that the NMFS has not yet completed its formal biological opinion. Therefore, it is not known whether the NMFS will join the other defendants in their findings.

Mem. at 7. The diffusers, however, have already been constructed and are in place, and there will be no further construction on the ocean floor. United States' Mem. at 16. Furthermore, though the outfall tunnel boring machine will continue to operate, its operation and the noise it generates is not likely to affect the listed species adversely. 1993 BA, ch. 4, at 3–4; Declaration of Charles I. Malme ("Malme Decl.") (United States Ex. 8) ¶ 5. Remaining construction activities on the outfall tunnel will take place about 400 feet below the ocean floor. 1993 BA, ch. 4, at 4. Noise from the tunnel boring machine in the water above has been found to be less powerful than the noise produced by diesel tugboats that regularly operate in Boston Harbor. 1993 BA, ch. 4, at 4; Malme Decl. ¶ 6. Furthermore, the impact of noise from the boring machine on Stellwagen Bank, the nearest preferred habitat for whales, is expected to be comparable to, or less than, historical noise levels reported for similar shallow, coastal water areas, and less than that which has been observed to cause behavioral responses in whales. Malme Decl. ¶ 5.[17]

Based on the extensive environmental impact studies conducted by the EPA in 1988 and 1993, the findings of which have not been scientifically controverted, I find no evidence that the construction or operation of the outfall tunnel is likely to jeopardize the continued existence of endangered species in the bays. Though I am ready to revisit the question upon the first, substantial scientific findings to the contrary, I conclude that the plaintiffs have not shown any likelihood of harm to endangered species.

### 2. *Section 7(c)*

■ In addition to their § 7(a)(2) claim, the plaintiffs also assert that the defendants violated § 7(c) of the ESA. Section 7(c) states that a biological assessment, when required, "shall be completed . . . before any contract for construction is entered into and before construction is begun with respect to such action." 16 U.S.C. § 1536(c). *See* 50 C.F.R. § 402.12(b)(2) (stating same). The plaintiffs contend that the defendants did, in fact, contract for and begin construction of the outfall tunnel prior to completing the necessary biological assessment.[18]

I find, however, that the EPA completed the required biological assessment by July, 1988, before any contracts were entered for the construction of the tunnel and before construction had begun. Specifically, the EPA's Draft Supplemental Environmental Impact Statement ("DSEIS") was completed on April 1, 1988, and its Final Supplemental Environmental Impact Statement ("FSEIS") was completed on July 31, 1988. I find that, taken together, these two environmental impact statements satisfied the ESA's requirements for a biological assessment.[19] Significantly, the MWRA did not award the contract for construction of the outfall tunnel

---

17. Though it is inappropriate for a court, when reviewing agency decisionmaking, to consider affidavits made as "post hoc" rationalizations of agency action, *see supra,* at 9 n. 10, I take the Malme Declaration into account here because Malme's findings are not "post hoc" rationalizations, but were incorporated into the 1993 BA (ch. 4, at 4) and, therefore, were part of the EPA's original decisionmaking record.

18. The purpose of the biological assessment is to determine what impact the project will have on endangered species. 50 C.F.R. § 402.12(a).

19. Note that there are no strict requirements for what the biological assessment should include; its contents are discretionary with the agency preparing it. *See* 50 C.F.R. § 402.12(f). The implementing regulations do list certain criteria that the agency may consider:

1) The results of an on-site inspection of the area affected by the action to determine if listed or proposed species are present or occur seasonally.
2) The views of recognized experts on the species at issue.
3) A review of the literature and other information.
4) An analysis of the effects of the action on the species and habitat, including consideration of cumulative effects, and the results of any related studies.
5) An analysis of alternate actions considered by the Federal agency for the proposed action.
*Id.* A review of the SEIS indicates that the EPA took at least four of these five suggested criteria into consideration. Though the EPA did not conduct an on-site inspection to determine whether endangered species are present, they relied on previous reports to state their conclusion that various endangered species are present in the bays. *See* DSEIS, ch. 4, at 45. For simplicity's sake, I shall refer to these studies together as the "SEIS."

until July 18, 1990, almost two years after completion of this first biological assessment.[20] United States Mem. at 28. Therefore, I find that the defendants prepared a proper biological assessment in a timely fashion, in accordance with the requirements of § 7(c) of the ESA.[21]

■ Furthermore, even were I to find that the SEIS did not constitute a proper biological assessment, the EPA completed a second biological assessment of the tunnel project on April 26, 1993. The 1993 BA confirmed the EPA's original conclusion that the outfall tunnel project is not likely to impact endangered species adversely. Though contracts for construction of the outfall tunnel had been entered by that time and construction had begun, the 1993 BA satisfied the spirit, if not the letter, of § 7(c). To recommend that this Court terminate the outfall tunnel project simply for an alleged violation of procedure, despite no evidence of a likely threat to endangered species, strikes this Court as an exaltation of form over substance. It also appears to be at odds with caselaw. *See Weinberger v. Romero–Barcelo*, 456 U.S. 305, 314–15, 102 S.Ct. 1798, 1804, 72 L.Ed.2d 91 (1982) (court not required to issue injunction to stop technical violations of Federal Water Pollution Control Act where discharge of military ordnance not polluting waters and, therefore, not in tension with purpose of statute). *Cf. Amoco Production Co. v. Gambell*, 480 U.S. 531, 544, 107 S.Ct. 1396, 1403, 94 L.Ed.2d 542 (1987) (criticizing court for giving too much weight to procedural violation of Alaska National Interest Lands Conservation Act and not enough to purpose of statute which had not been violated). *But see TVA v. Hill*, 437 U.S. at 173–74, 98 S.Ct.

at 2291 (court required to issue injunction to prevent start-up of dam where dam would cause extinction of endangered species and violate letter *and purpose* of ESA).

■ Still, the plaintiffs contend that the ongoing construction of the tunnel violates § 7(c) because the NMFS has not yet issued its formal biological opinion on the effect the outfall project will have on endangered species. Section 7(c), however, requires only that the biological assessment, not the biological opinion, be completed before contracts are formed or construction is begun on the proposed action. *See* 16 U.S.C. § 1536(c). *See also* 50 C.F.R. § 402.12(b)(2) (stating that "biological assessment shall be completed before any contract for construction is entered into and before construction is begun") and 50 C.F.R. § 402.02 (distinguishing between "biological assessment," which is prepared by federal agency proposing action, and "biological opinion," which is prepared by NMFS). Therefore, continuing construction on the outfall project, despite the fact that the NMFS has not completed its biological opinion, does not violate § 7(c).

Finally, the plaintiffs point out that the environmental impact of at least one aspect of the proposed construction plan has not yet been studied. As the plaintiffs correctly assert, the MWRA is considering using explosives to blast the last two kilometers of the outfall tunnel, but has yet to evaluate the impact of such an approach on marine animals. Nonetheless, the MWRA still has not made the decision to use explosives, and there are alternative approaches to completing the tunnel should blasting prove to be

---

20. The plaintiffs assert that the SEIS cannot be construed by this Court as satisfying the requirements of a biological assessment for purposes of § 7(c) of the ESA. They base that contention, in part, on the fact that the defendants allegedly did not intend for the SEIS to serve as a biological assessment. I find, however, that the EPA's intent is irrelevant. What matters is that, in the SEIS, the EPA explicitly examined the potential impact of the outfall tunnel on endangered species in the bays; the examination was reasonably thorough; and the conclusion that the outfall tunnel does not pose a likely threat to endangered species was adequately considered.

21. The plaintiffs charge that the Army Corps of Engineers failed to meet the requirement that it prepare a biological assessment in connection with its role in the outfall tunnel project. The ESA's implementing regulations, however, allow an agency to fulfill the biological assessment requirement by adopting a previous biological assessment, which was prepared in connection with the same or a similar proposed action. 50 C.F.R. § 402.12(g). Thus, by incorporating the EPA's biological assessment in its Record of Decision, the ACOE effectively met the requirements of § 7(c) of the ESA. United States Mem. at 28 (acknowledging ACOE's adoption of SEIS by reference).

environmentally unsound. United States' Mem. at 26 n. 12, 39. Therefore, it would be premature to stop construction at this point simply to require further analysis of the effect blasting would have. With respect to alleged violations of § 7(c), then, I repeat my finding that the plaintiffs have not demonstrated a likelihood of success on the merits.[22]

### 3. *Section 7(d)*

Lastly, the plaintiffs allege that the MWRA's continued construction of the outfall tunnel violates § 7(d) of the ESA.[23] The critical question under § 7(d) is whether continued construction of the outfall tunnel will preclude the development of ecologically safer discharge alternatives, should the tunnel ultimately be deemed a threat to the survival of endangered species in the bays. The plaintiffs claim that the slightest, additional investment in the tunnel has the "effect of foreclosing" alternative discharge possibilities and, thus, violates § 7(d).[24]

Further construction of the outfall tunnel, however, will not preclude the development of reasonable and prudent alternatives. The defendants offer several plausible scenarios for incorporating the outfall tunnel into alternative discharge approaches. *See* United States Mem. at 37–38. For example, if necessary, the MWRA could employ the existing outfalls at Deer Island to reduce the flow of sewerage from the outfall tunnel, or cease the discharge entirely during specific periods when the alleged risks to listed species was greatest. *Id.,* at 37. The MWRA could also delay use of the outfall tunnel until the secondary treatment facilities come on line in 1998 and 1999. *Id.* In addition, the MWRA could, admittedly at significant cost, install additional treatment facilities to supplement the primary and secondary treatment facilities.

**22.** Ordinarily, the competing interests of the public may not be weighed against the interest of preserving endangered species. *See TVA v. Hill,* 437 U.S. at 173–74, 98 S.Ct. at 2291. *See also, supra,* at 107. However, where the appropriate biological assessment has been conducted and there is no evidence that the agency action poses a threat to endangered species, as is the case here, there is no harm in noting the public's keen and legitimate interest in seeing this sewerage project advance. Construction of the outfall tunnel is now well under way. The vertical shaft has been constructed; the tunnel boring machine has been purchased and installed; the diffusers are in place; and approximately one and a half miles of the tunnel have been drilled. As of May 31, 1993, approximately $148,621,000 had already been invested in the design and construction of the tunnel. Armstrong Aff. (State Def. Ex. 1) ¶ 11. Termination of the construction contract would cost an additional $48 million. *See id.* ¶ 20. It would also prolong the adverse impact on coastal waters caused by the present substandard treatment system. Thus, given the evidence that the outfall tunnel is unlikely to impact endangered species adversely, the additional cost of a shutdown is just more reason not to halt the tunnel project.

**23.** Section 7(d) states that, after formal consultation is initiated, a federal agency "shall not make any irreversible or irretrievable commitment of resources with respect to ... agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures" that could be pursued without a likelihood of risk to endangered species. 16 U.S.C. § 1536(d).

**24.** The plaintiffs seem to believe that § 7(d) prohibits absolutely all construction activities during the period of formal consultation with the NMFS. *See* Bays' Legal Fund Mem. at 35; Bays' Legal Fund Response to "Amici" Affidavits, at 8 n. 4. The plaintiffs argue that:

> The practical effect of any commitment of money is to build momentum. The more money spent on any single option ... the less likely it is that alternatives will be chosen. No single dollar ... commits completely, but complete foreclosure is not the statutory test: if an action 'has the effect of foreclosing' it meets the test....

Bays' Legal Fund Mem. at 35 (quoting Houck, *The "Institutionalization of Caution" Under § 7 of the Endangered Species Act: What Do You Do When You Don't Know?,* 12 Envt'l L.Rep. (Envt'l L.Inst.) 15001, 15010 (1982)). Such a rigid construction of the statute, however, is not justified. The statute does not prohibit each and every permanent commitment of resources, only those which have "the effect of foreclosing" the formulation of alternatives. *See* 16 U.S.C. § 1536(d). Thus, the statute calls for some judicial discretion to determine whether an agency's decision to proceed with action, prior to the completion of formal consultation with the NMFS, could have "the effect of foreclosing" alternatives and could, therefore, be considered arbitrary and capricious.

The plaintiffs have not met their burden of showing that the EPA's and the ACOE's decision to allow construction on the tunnel to proceed was arbitrary or capricious given the remaining discharge alternatives.

Though there is no present indication that any of these measures will be required, they demonstrate that continued construction of the outfall tunnel, at least until the NMFS issues its biological opinion and formal consultation is completed, will not foreclose the possible development of alternative avenues of wastewater removal. Halting construction altogether, with an eye toward abandoning the outfall tunnel project, would not be a reasonable or prudent approach, given the adverse impact that such non-action has already had on coastal water quality. Based on the record before me, I cannot find that the defendants' decision to allow tunnel construction to proceed was arbitrary and capricious. For the foregoing reasons, I conclude that the plaintiffs have failed to prove a violation of §§ 7(a)(2), (c) or (d) of the ESA.

B. *The National Environmental Policy Act*

 The plaintiffs further allege that the effect of the outfall tunnel on the aquatic environment has been inadequately studied and reported on and that the defendants have, therefore, violated NEPA.[25] In particular, the plaintiffs allege that the defendants did not evaluate the cumulative effect on endangered species of all sources of water pollution in the bays. Greenworld Mem. at 17. A quick look at the 1993 BA belies that allegation, however. The 1993 BA does, indeed, discuss the cumulative impact on endangered species of numerous pollution sources, with particular focus on the continued use of the Massachusetts Bay Disposal Site for dredged material. *See* 1993 BA, ch. 4, § 4. *See also* 1988 DSEIS § 6.3.1.

The plaintiffs also claim that the defendants violated NEPA by allegedly inadequately explaining the basis for their conclusion that the outfall tunnel project will not have a significant impact on endangered species. Greenworld Mem. at 18. According to the plaintiffs, NEPA requires an agency's environmental impact statement ("EIS") to supply a "convincing statement of reasons" why potential effects from the agency's

planned action will be ecologically insignificant. Greenworld Mem. at 18 (citing *Save the Yaak Committee v. Block,* 840 F.2d 714, 717 (9th Cir.1988)). The plaintiffs, however, are stretching the meaning of caselaw to fit their argument. In *Save the Yaak,* on which the plaintiffs rely, the court only stated that pursuant to NEPA, an agency must provide such a statement *if* the agency did not prepare a formal EIS. *Id.,* 840 F.2d at 717. Here, however, the EPA did prepare an EIS with respect to the outfall tunnel project. *See* SEIS. So the plaintiffs' complaint is misplaced. Furthermore, the EPA's SEIS was thorough and voluminous and provided ample support for its conclusion that the tunnel project will not have a significant impact on the listed species in the bay. *See* United States Mem. at 4–5 (summarizing results of EIS). Thus, I find that the plaintiffs' claims under NEPA are without merit.

C. *The Marine Mammal Protection Act*

 Finally, the plaintiffs claim that the construction and use of the outfall tunnel will result in a "taking" of the Northern Right whale, in violation of the MMPA. Greenworld Mem. at 20. The MMPA prohibits the "taking" of any endangered marine mammals for nonscientific purposes. 16 U.S.C. § 1371(a)(3)(B) (1988). The term, "take," is defined as including the killing or harassing of a marine mammal, or "the doing of any other negligent or intentional act which results in disturbing or molesting a marine mammal." 50 C.F.R. § 216.3.

There is, however, insufficient evidence to find that construction and use of the proposed sewerage treatment facilities, including the outfall tunnel, will result in a "taking" of the right whale, or a disturbance of the animal of any kind. Two biological studies by the EPA have demonstrated that the outfall tunnel project is unlikely to have a significant effect on any of the endangered species in the bays. Furthermore, though the NMFS is presently engaged in a thorough evaluation of its own on this question, it already has concluded preliminarily that the tunnel is

25. NEPA requires that any federal agency planning an action with significant environmental consequences must evaluate and report on the environmental impact of the planned action. 42 U.S.C. § 4332(2)(C)(i) (1988).

unlikely to pose a threat to any listed species. United States Mem. at 4 (referring to February, 1988 NMFS letter sent to the EPA).

■ The plaintiffs point out, however, that there has been no finding that the outfall tunnel will have zero effect on the right whale and contend that the MMPA does not allow for a "negligible impact" exception to its "taking" prohibition. Greenworld Mem. at 20 (citing *Kokechik Fishermen's Ass'n v. Secretary of Commerce*, 839 F.2d 795, 802 (D.C.Cir.1988), *cert. den., Verity v. Center for Environmental Educ.*, 488 U.S. 1004, 109 S.Ct. 783, 102 L.Ed.2d 775 (1989)). The plaintiffs, however, overstate the "negligible impact" rule established in *Kokechik*. The court in *Kokechik* held that there was no "negligible impact" exception to the rule where the takings were a certainty, as opposed to a mere remote possibility. *Id.*, 839 F.2d at 802. Yet, here, the plaintiffs have not shown *any* likelihood that a "taking" will occur. Therefore, even applying the "negligible impact" rule, I find that in the present circumstances the MMPA does not prohibit the construction or use of the outfall tunnel.

In the end, I conclude that the plaintiffs cannot prevail on the merits of any of their claims. Most significantly, they have not established that the outfall tunnel is likely to have an adverse impact on endangered species in the bays. Furthermore, they have not shown that the defendants' findings to that effect, or their related actions, were arbitrary and capricious. Consequently, after considering the merits of the plaintiffs' claims, this Court will enter judgment for the defendants.

SO ORDERED.