**PACIFIC RIVERS COUNCIL; and The Wilderness Society, Plaintiffs,**

**v.**

**Jack Ward THOMAS, in his official capacity as Chief of the United States Forest Service; and United States Forest Service; Defendants.**

**and**

**Intermountain Forest Industry Association; Shearer Lumber Products; Boise Cascade Company Associated Logging Contractors; Hecla Mining Company; Meridian Gold Company; and Thompson Creek Mining Company, Defendant–Intervenors.**

**CV. No. 94–0159–S–HLR/DAE.**

United States District Court, D. Idaho.

July 5, 1996.

Todd D. True, Adam J. Berger, Kristen L. Boyles, Sierra Club Legal Defense Fund Inc., Seattle, WA, Laird J. Lucas, Land & Water Fund of the Rockies, Boise, ID, for Pacific Rivers Council.

Albert P. Barker, Hawley Troxell Ennis & Hawley, Boise, ID, Elizabeth H. Temkin, Scott W. Hardt, Ballard Spahr Andrews & Ingersoll, Denver, CO, for Hecla Mining Company.

B. Newal Squyres, Brian J. King, Murray D. Feldman, Holland & Hart, Boise, ID, Laurie L. Korneffel, Dean R. Massey, Parcel Mauro Hultin & Spaanstra, Denver, CO, Michael J. Brennan, C. William Groscup, Holland & Hart, Washington, DC, for Meridian Gold Company.

Scott L. Campbell, Elam & Burke, Boise, ID, Laurie L. Korneffel, Dean R. Massey, Parcel Mauro Hultin & Spaanstra, Denver, CO, for Thompson Creek Mining Company.

D. Marc Haws, Asst. U.S. Atty., U.S. Attorney's Office, Boise, ID, Lois J. Schiffer, U.S. Dept. of Justice, Land & Natural Resources Division, Washington, DC, Elinor Colbourn, U.S. Dept. of Justice, Washington, DC, Fred R. Disheroon, Charles R. Schockey, James C. Kilbourne, U.S. Dept. of Justice, Environment & Natural Resources Division, Washington, DC, for Jack Ward Thomas.

D. Marc Haws, Asst. U.S. Atty., U.S. Attorney's Office, Boise, ID, Lois J. Schiffer, U.S. Dept. of Justice, Land & Natural Resources Division, Washington, DC, Bruce M. Smith, Patrick D. Madigan, Rosholt Robertson & Tucker, Boise, ID, Elinor Colbourn, U.S. Dept. of Justice, Washington, DC, Fred R. Disheroon, Charles R. Shockey, James C. Kilbourne, U.S. Dept. of Justice, Environment & Natural Resources Division, Washington, DC, for U.S. Forest Service.

Bruce M. Smith, Patrick D. Madigan, Rosholt Robertson & Tucker, Boise, ID, for Intermountain Forest Industry Association, Shearer Lumber Products, Boise Cascade Company.

Nancy A. Wolff, Richard S. Christensen, Morris & Wolff, St. Maries, ID, for Associated Logging Contractors, Inc.

Charles L.A. Cox, Justin W. Julian, Evans Keane Koontz Boyd Simko & Ripley, Kellogg, ID, for United States Antimony Corporation.

## ORDER DENYING DEFENDANTS' MOTION TO MODIFY ORDER ON PENDING CLAIMS AND DENYING DEFENDANTS' MOTION TO STRIKE DECLARATION OF CINDY DEACON WILLIAMS

DAVID ALAN ERZA, District Judge.

The court heard Defendants' Motion on July 2, 1996. Kristen L. Boyles, Esq., and Laird J. Lucas, Esq., appeared at the hearing on behalf of Plaintiffs Pacific Rivers Council and The Wilderness Society ("Plaintiffs" or "PRC"); Elinor Colburn, Esq., and Joseph Stringer, Esq., appeared at the hearing on behalf of Defendants Jack Ward Thomas and the United States Forest Service ("Defendants" or "Forest Service"). After reviewing the motion and the supporting and opposing memoranda, viewing the site of the proposed action, and having heard oral argument of counsel, the court DENIES Defendants' Motion to Modify Order on Pending Claims. The court also DENIES as MOOT Defendants' Motion to Strike Declaration of Cindy Deacon Williams.

### BACKGROUND

The focus of the instant motion is a 48,000 acre-tract of land, referred to as the "Elk

Creek" allotment.[1] The Elk Creek allotment is located in the Bear Valley Basin within the Loman Ranger District of the scenic Boise National Forest, and is comprised of three pastures: (1) the Elk Creek Riparian Pasture ("Riparian Pasture"); (2) the Poker Ayers Unit; and (3) the Stanfield Unit. The primary stream running through the allotment is Elk Creek, a meandering stream channel. *See* Exhibit 1 (Section 7(d) Determination) to Motion to Modify at 3–4. Numerous tributaries of Elk Creek also run through the allotment. The Riparian Pasture and the Poker Ayers Unit are the subjects of Defendants' motion.

The Bear Valley Basin was designated critical habitat for Snake River spring/summer Chinook Salmon ("salmon") on December 28, 1993. As published in the Federal Register, critical habitat includes the entire Bear Valley Basin. 50 C.F.R. § 226.1 et seq. The threatened salmon spawn in Elk Creek, creating annually between two dozen to well over one hundred redds (nests), beginning from July to August and concluding by approximately the first week in September. The Riparian Pasture consists of 8,000 acres and spawning habitat; the Poker Ayers Unit consists of 16,000 acres containing tributaries and rearing habitat; and the Stanfield Unit consists of 24,000 acres, including spawning habitat.

The Elk Creek allotment is permitted to Cattle, Inc., and A.D. Watkins ("permittees"), and is managed as part of a corporate ranch operation by ranch manager Rollin Baker. The permitted season of use is July 1 through October 15 (subject to modification for range conditions), during which time up to 738 cattle (cow/calf pairs) and 11 horses graze the allotment. In the past, during the season, the cattle graze in turn the three pastures identified above.

On December 20, 1995, this court entered an Order on Pending Claims enjoining the Forest Service from allowing any livestock to be turned out on the Elk Creek allotment until either: (1) consultation is completed pursuant to section 7(a)(2) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536(a)(2), or (2) a court hearing is held and the prohibition against grazing the allotment prior to completion is lifted. As required by section 1536(a)(2), the Forest Service has initiated consultation with the National Marine Fisheries Service ("NMFS") in order to insure that the proposed grazing activity "is not likely to jeopardize the continued existence of" the salmon. However, it is undisputed that consultation between the Forest Service and the NMFS is not yet complete. While the record reflects that the Forest Service and the NMFS have made some meaningful progress in their discussions, the NMFS's present position is that it does not concur in the Forest Service's grazing proposal for the Elk Creek allotment. *See* AR 26, AR 28, AR 31.[2]

The Forest Service proposes that this year, the livestock be scheduled to turn out on the Riparian Pasture in the Elk Creek allotment on or about July 8, 1996 for about one to three weeks, and that turn-out on the Poker Ayers Unit occur on July 22–29, 1996 for approximately five to six weeks.[3] Because consultation is not expected to be complete as of these turn out dates, the Forest Service presents the court with a document entitled "Section 7(d) Determination for the Elk Creek Allotment (Riparian Pasture and

1. The day before the hearing on the Forest Service's motion, the court was provided with an insightful opportunity to visit the Elk Creek allotment together with counsel for Plaintiffs and Defendants and party representatives. No testimony was taken by the court during the site visit.

2. The Forest Service has submitted to the court the administrative record of the Forest Service's § 7(d) determination. The documents contained therein are denoted by "AR."

3. Currently, the Forest Service is not seeking relief from the court's prohibition against grazing as to the third pasture of the Elk Creek allotment (Stanfield Unit), as turn out on this pasture is not scheduled until early September. According to the Forest Service, it is anticipated that consultation will be complete prior to that time. Motion to Modify at 1 n. 1. However, the Forest Service proposes that the Stanfield Unit be grazed beginning the first week in September for approximately five to six weeks. The Forest Service also states that the timing of the moves from one pasture to the next is "dictated by the condition of the pasture, the maximum permitted time, and/or the needs of the listed Snake River salmon." Motion to Modify at 5.

Poker Ayers Unit)," issued on June 21, 1996. According to the Forest Service, section 7(d) of the ESA provides it with the authority to determine whether it can proceed with an proposed action as long as it has initiated consultation with the NMFS. Under section 7(d), an agency:

> [S]hall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section.

16 U.S.C. § 1536(d). In its section 7(d) determination, the Forest Service has concluded that grazing on the Riparian Pasture and on the Poker Ayers Unit prior to completion of consultation with the NMFS complies with the ESA and is "not likely to adversely affect" the salmon. Accordingly, the Forest Service now moves for a modification of the court's Order on Pending Claims, in order to permit the livestock to be turned out prior to the completion of consultation.

Plaintiffs oppose the motion, principally arguing that the ESA does not entitle the Forest Service to the exception sought here. Alternatively, Plaintiffs take the position that the Forest Service errs in its determination that turning out the livestock on the two pastures is not likely to adversely affect the endangered salmon.

### STANDARD OF REVIEW

■ The parties dispute whether the applicable standard of review with respect to the Forest Service's § 7(d) determination is deferential or de novo. The Forest Service argues that the § 7(d) action is an agency action governed by the Administrative Procedure Act, which provides that agency actions, findings and conclusions may be set aside only if "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (D). Plaintiffs on the other hand, claim that De-

fendants bear the burden of proof because Plaintiffs have not challenged the Forest Service's § 7(d) determination. Plaintiffs are correct.[4]

■ As stated above, this court entered an Order on Pending Claims in this action on December 20, 1995, enjoining the Forest Service from turning out livestock to graze on the Elk Creek allotment. An injunction is an equitable remedy issued under established principles which guide courts of equity. *Sierra Club v. United States Army of Corps of Engineers,* 732 F.2d 253, 256 (2d Cir.1984). A court retains the power to modify the terms of its injunction in the event that changed circumstances require it. *United States v. State of Oregon,* 769 F.2d 1410, 1416 (9th Cir.1985); *System Federation v. Wright,* 364 U.S. 642, 646, 81 S.Ct. 368, 370, 5 L.Ed.2d 349 (1961); *Anderson v. Central Point School Dist. No. 6,* 746 F.2d 505, 507 (9th Cir.1984) (per curiam). Generally, in order to prevail on a motion to modify, the movant must establish a change in circumstances that would make the original preliminary injunction inequitable. *See Favia v. Indiana Univ. of Pennsylvania,* 7 F.3d 332, 340 (3d Cir.1993); *cf. Flag Fables, Inc. v. Jean Ann's Country Flags & Crafts, Inc.,* 730 F.Supp. 1165, 1178 (D.Mass.1989) (movant must persuade court by a preponderance of the evidence that either the facts or governing law have somehow changed or that the court was clearly erroneous in its original finding of facts or conclusions of law before granting a motion to dissolve an injunction).

■ Furthermore, the Court of Appeals for the Ninth Circuit has recognized that the traditional test for a preliminary injunction is not the test for injunctions under the Endangered Species Act. *National Wildlife Federation v. Burlington N. R.R., Inc.,* 23 F.3d 1508, 1510–11 (9th Cir.1994). "In cases involving the ESA, Congress removed from courts their traditional equitable discretion in injunction proceedings of balancing the parties' interests." *Id.* (citing *Friends of the Earth v. United States Navy,* 841 F.2d 927,

---

4. Regardless, as discussed below, the court does not review the merits of the Forest Service's § 7(d) determination. Thus, assuming *arguendo* that the arbitrary and capricious standard of review is proper here, the court need not utilize it.

933 (9th Cir.1988)). The ESA's language, structure and history demonstrates Congress's determination that the balance of hardships and the public interest tips heavily in favor of protected species. *Id.* (citations omitted).

## DISCUSSION

In support of its motion, the Forest Service contends that its biologists "have analyzed whether proceeding with the proposed grazing activity on [the Riparian Pasture and the Poker Ayers Unit] would comply with the constraints set forth in section 7(d) of the ESA[,] [and that] [b]ased on that analysis, the Forest Service has determined that the grazing would fully comply with section 7(d)." Motion to Modify at 10. Thus, the Forest Service argues that the court should modify its pending order because "there is no basis for a continued prohibition on this grazing activity." *Id.* Additionally, the Forest Service maintains that prohibiting grazing on the first two pastures would result in undue hardship with respect to the permittee.[5]

### I. The ESA

 The Endangered Species Act of 1973, 16 U.S.C. §§ 1531, *et seq.*, is a comprehensive statutory scheme aimed at conserving endangered and threatened species and the ecosystems on which they depend. 16 U.S.C. § 1531(b). In *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 174, 98 S.Ct.

2279, 2291, 57 L.Ed.2d 117 (1978), the United States Supreme Court recognized that the Act's "language, history, and structure" evidenced "beyond a doubt" that "Congress intended endangered species to be afforded the highest of priorities." The Court found that "the plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184, 98 S.Ct. at 2296.[6] To this end, section 7(a)(2) of the ESA sets forth a requirement that each federal agency:

> [S]hall, in consultation with and with the assistance of [the National Marine Fisheries Service and/or the Fish and Wildlife Service] ... insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined ... to be critical....

16 U.S.C. § 1536(a)(2). To assist agencies in complying with this requirement, section 7 and its implementing regulations set out a detailed consultation process for determining the biological impacts of proposed activities. *See* 16 U.S.C. § 1536(b); 50 C.F.R. Part 402. If, as here, the action agency determines that its action is "likely to adversely affect" a protected species, it must engage in "formal consultation" with NMFS. 50 C.F.R. § 402.14(a).[7] Formal consultation results in

---

5. The Forest Service submits the Affidavit of Rollin Baker, the ranch manager for the allotment, in which he attests:

> If we are not allowed to use the allotment this year (at a minimum the Elk Creek Riparian Pasture and Poker Ayers Pasture), my ranch will face a substantial loss. I will have to sell the cattle I would normally take to the Forest. Should I have to sell the 738 head of permitted cattle, the loss would be disastrous due to the current down market. Selling the 738 cows at this time would create a loss of approximately $225,000. If I am allowed to graze at least these two pastures, market conditions may improve by the time I have to take the cattle off the Forest. At that point the loss would not be so great.

Rollin Aff. at ¶ 4. The court notes, however, that the permittee and the Forest Service have been aware of the existence of this court's injunction since December 1995.

6. The Court stated:

> One would be hard pressed to find a statutory provision whose terms were any plainer than those in § 7 of the Endangered Species Act. Its very words affirmatively command all federal agencies "to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence" of an endangered species or "result in the destruction or modification of habitat of such species ..."
> This plain language admits of no exception. *TVA v. Hill,* 437 U.S. at 173, 98 S.Ct. at 2291 (internal citations omitted).

7. If the action agency determines that an action "may affect" a protected species, but is "not likely to adversely affect" the species, it may attempt "informal consultation" with NMFS. 50 C.F.R. §§ 402.13, 402.14(b)(1). An agency's "not likely to adversely affect" determination becomes final for purposes of consultation only when NMFS concurs in writing in the determination. 50 C.F.R. §§ 402.13, 402.14(b)(1).

a "biological opinion" from NMFS determining whether the action is likely to jeopardize the listed species and describing, if necessary, "reasonable and prudent alternatives" [8] that will avoid a likelihood of jeopardy. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.02.[9] After meaningful consultation, however, the Federal agency—here, the Forest Service—possesses the ultimate decisionmaking authority to determine whether it may proceed with an action. *See National Wildlife Federation v. Coleman*, 529 F.2d 359, 371 (5th Cir.), *cert. denied*, 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 *cert. denied*, 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976).

## II. Applicability of 7(d)

The Forest Service argues that while consultation is pending on the effects of livestock grazing on the listed salmon and the Elk Creek allotment, if it desires to allow some part of that activity to proceed prior to completing consultation, the Forest Service must determine whether proceeding with grazing on the Riparian Pasture and on the Poker Ayers Unit would comply with section 7(d) of the ESA. Motion to Modify at 13. As stated above, section 7(d) prohibits an action agency from making "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section." 16 U.S.C. § 1536(d).

Plaintiffs argue that the Forest Service misreads and misapplies section 7(d). First, Plaintiffs dispute that mere *initiation* of consultation is enough to insure that the Forest Service does not violate its substantive duties to the salmon under the section 7(a)(2). Rather, Plaintiffs reason that under section 7(a)(2)'s plain language, legislative history, and its underlying purpose, *completion* of the

8. " 'Reasonable and prudent alternatives' refer to alternative actions *identified during formal consultation* that can be implemented in a manner consistent with the intended purpose of the action, that can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction, that is economically and technologically feasible, and that the Director believes would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.02 (emphasis added).

9. The specific requirements of the NMFS during formal consultation are worth citing here:

(1) Review all relevant information provided by the Federal Agency or otherwise available. Such review may include an on-site inspection of the action area with representatives of the Federal agency and the applicant.
(2) Evaluate the current status of the listed species or habitat.
(3) Evaluate the effects of the action and *cumulative effects* on the listed species or critical habitat.
(4) Formulate its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.
(5) Discuss with the Federal agency and any applicant the Service's review and evaluation conducted under paragraphs (g)(1)–(3) of this section, the basis for any finding in the biological opinion, and the availability of reasonable

and prudent alternatives (if a jeopardy opinion is to be issued) that the agency and the applicant can take to avoid a violation of section 7(a)(2) ...
(6) Formulate discretionary conservation recommendations, if any, which will assist the Federal agency in reducing or eliminating the impacts that its proposed action may have on listed species or critical habitat.
(7) Formulate a statement concerning incidental take, if such take may occur.
(8) In formulating its biological opinion, any reasonable and prudent alternatives, and any reasonable and prudent measures, the Service will use the best scientific and commercial data available and will give appropriate consideration to any beneficial actions taken by the Federal agency or applicant, including any actions taken prior to the initiation of consultation.
50 C.F.R. § 402.14(g) (emphasis added). "Effects of the action" as used in 50 C.F.R. § 402.14(g)(3) are defined as "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline. The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action are that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation process ..." 50 C.F.R. § 402.02.

consultation process with NMFS is required before the Forest Service can proceed with any action that might have an adverse affect on the salmon. Second, Plaintiffs assert that section 7(d) does not operate to create a "loophole" to section 7(a)(2)'s consultation requirement, as the Forest Service suggests. Both of these arguments are addressed in turn.

■ Section 7(d) was drafted in response to the Supreme Court's decision in *TVA v. Hill*, 437 U.S. 153, 98 S.Ct. 2279. In that case, the district court found that there were "no alternatives to impoundment of the reservoir, short of scrapping the entire project," and that "some $53 million would be lost in nonrecoverable obligations." *Id.* at 166, 98 S.Ct. at 2288. The district court concluded that "at some point in time a federal project becomes so near completion (as to be) incapable of modification.... Where there has been an irreversible and irretrievable commitment of resources by Congress to a project over a span of almost a decade, the Court should proceed with a great deal of circumspection." *Id.* The district court refused to enjoin the completion of the Tellico Dam, even though the ESA would be violated without the injunction. One court has commented:

> It is against this background that § 7(d) must be scrutinized. Congress enacted § 7(d) to prevent Federal agencies from "steamrolling" activity in order to secure completion of the projects regardless of their impact on endangered species. As the Supreme Court noted, the District Court was concerned in *TVA v. Hill* because "a large portion of the $78 million already expended would be wasted." In response, Congress enacted § 7(d) to preclude the investments of large sums of money in any endeavor if (1) at the time of the investment there was a reasonable likelihood that the project, at any stage of

development, would violate § 7(a)(2), and (2) that investment was not salvageable (i.e. it could not be applied to either an alternative approach to the original endeavor or to another project).

*North Slope Borough v. Andrus*, 486 F.Supp. 332, 356 (D.D.C.), *aff'd in part and reversed in part on other grounds*, 642 F.2d 589 (D.C.Cir.1980).[10] By requiring consultation to be initiated prior to the commitment of resources, Congress specifically sought to prevent a situation like the one presented in *TVA v. Hill*, where opening the dam would have violated the ESA, but closing the dam would have not constituted a reasonable, economically feasible alternative in light of the $78 million investment. While the underlying purpose of § 7(d) may be readily apparent, its application is not as abundantly clear.

■ Courts have consistently stated that the purpose of § 7(d) is to "ensur[e] that the status quo will be maintained during the consultation process." *Conner v. Burford*, 848 F.2d 1441, 1455 n. 34 (9th Cir.1988), *cert. denied*, 489 U.S. 1012, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989); *see also Lane County Audubon Soc'y v. Jamison*, 958 F.2d 290, 294 (9th Cir.1992) ("In order to maintain the status quo, section 7(d) forbids "irreversible or irretrievable commitment of resources" during the consultation period.") Here, the Forest Service unpersuasively argues that the "status quo" dictates that the livestock should be turned out. However, this argument belies common sense. In light of the protective purpose of the ESA, the status quo necessarily contemplates the absence of action in this particular case—i.e., disallowing grazing activity. *See TVA v. Hill*, 437 U.S. at 169, 98 S.Ct. at 2289 (quoting *Hill v. TVA*, 549 F.2d 1064, 1070 (6th Cir.1977)) ("Our responsibility under [the ESA] is to preserve the status quo where endangered species are threatened, thereby guaranteeing

---

10. The district court in *North Slope* clarified that "[i]f the resources are salvageable, the resources would not be wasted, and thus, not irretrievably committed within the meaning of § 7(d)." 486 F.Supp. at 356 n. 87. The district court concluded that "[w]hen no definitive biological opinion can be issued *because of inadequate information,* the ESA does not require that the government halt all activities, unless the intermediate activi-

ties violate § 7(a)(2). Rather, the ESA permits non-jeopardizing activities, so long as the § 7(d) mandate is not violated." *Id.* at 357 (emphasis added). The Court of Appeals for the District of Columbia affirmed the district court's ruling that "preliminary activities" permitted by a lease sale of federal properties with oil and gas potential entailed no violation of § 7(d). 642 F.2d at 611.

the legislative or executive branches sufficient opportunity to grapple with the alternatives."); *see also Pacific Rivers Council et al. v. Thomas*, Civ. No. 92–1322, at 13 (D.Ore. October 20, 1996) (disagreeing with the federal defendant's assertion that ongoing grazing constituted the status quo). Thus, the status quo here refers to maintaining the prohibition on grazing the Elk Creek allotment.

■ At the heart of the parties' dispute here, is whether § 7(d) authorizes the Forest Service to proceed with certain action pending consultation. The court begins with the proposition set forth by Ninth Circuit in *Burford* that "[s]ection 7(d) does not amend section 7(a) to read that a comprehensive biological opinion is not required before the initiation of agency action so long as there is no irreversible or irretrievable commitment of resources. Rather, section 7(d) *clarifies the requirements of section 7(a)*, ensuring that the status quo will be maintained during the consultation process." 848 F.2d at 1455 n. 34; *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1056 n. 14 (9th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1793, 131 L.Ed.2d 721 (1995).

However, the court cannot agree with Plaintiffs' suggestion that no agency can ever proceed with proposed action until consultation is complete. Nor is Plaintiffs' position supported by the relevant case law. For example, in *Bays' Legal Fund v. Browner*, 828 F.Supp. 102, 112–13 (D.Mass.1993), the Environmental Protection Agency (EPA) initiated consultation with the NMFS in 1986 to determine the possible impact an outfall tunnel would have on certain endangered species. Two years later, in 1988, the NMFS issued its "tentative conclusion" that the sewerage treatment project "would not significantly affect" endangered species in the surrounding bays. *Id.* at 106. That same year, the EPA also issued an environmental impact statement concluding that the listed species

would not suffer any adverse impact from the wastewater treatment proposal. In 1990, the Army Corps of Engineers approved the proposal and allowed the construction of the outfall tunnel and diffusers, after concluding that the EPA had already "adequately addressed the significant environmental issues surrounding" its construction. *Id.* at 106–07. In 1991, the EPA conducted another biological assessment and reinitiated consultation with the NMFS. Prior to the issuance of the NMFS's biological opinion, the EPA concluded that the discharge from the outfall tunnel was not likely to cause an adverse impact on the endangered species, and construction of the tunnel continued.

The court denied the plaintiffs' motion to enjoin the defendants from proceeding with the construction of the outfall tunnel. First, the court found that there was no concrete evidence to substantiate the likelihood of threat to the threatened species.[11] Second, in addressing the plaintiffs' § 7(d) challenge to the defendants' continued construction of the outfall tunnel, the court rejected the plaintiffs' contention that § 7(d) prohibits absolutely all construction activities during the period of formal consultation with the NMFS. Importantly, the court emphasized that construction of the outfall tunnel would not preclude the development of reasonable and prudent alternatives because the defendants "offered several plausible scenarios for incorporating the outfall tunnel into alternative discharge approaches." *Id.* at 112. The court concluded that the alternative measures demonstrated that continued operation of the outfall tunnel, at least until the NMFS issued its biological opinion and formal consultation was completed, would not foreclose the possible development of alternative avenues for wastewater removal. *Id.*[12] The court therefore concluded that plaintiffs failed to prove a violation of § 7(d).

---

11. The court stated that "the ESA does not require the cessation of activities because of 'concerns' that some may have. Such a grave response is only required by statute when there is a 'likelihood' of an adverse impact to endangered species." 828 F.Supp. at 109.

12. The court further stated that, "[h]alting construction altogether, with an eye toward abandoning the outfall tunnel project, would not be a reasonable or prudent approach, given the adverse impact that such non-action has already had on coastal water quality." 828 F.Supp. at 113.

Additionally, in *North Slope Borough v. Andrus,* 486 F.Supp. 332 (D.D.C.), *aff'd in part and rev'd in part,* 642 F.2d 589 (D.C.Cir.1980), the action giving rise to the plaintiffs' ESA claim stemmed from an offshore oil and gas lease sale north of Alaska. The action agency, the BLM, had issued a final Environmental Impact Statement (EIS) which attempted to analyze the environmental impacts of the proposed joint lease sale and resulting activities, and requested formal consultation with the NMFS. The BLM entered into an express research agreement with the NMFS that entailed a five-year joint commitment to learning more about the endangered species. 498 F.Supp. at 342. Further, the NMFS specifically advised the BLM that it should adopt certain measures to the action proposed in the EIS, and the BLM adopted three of the four measures. *Id.* at 342. Thereafter, the Secretary of the Interior decided to proceed with the sale based on consideration of the EIS and on a final analysis of the "pros and cons" of the sale, "and discussing, among other things, consultations with NMFS that had occurred subsequent to the EIS." *Id.*

On appeal, the D.C. Circuit held that the Secretary of the Interior had "complied in essence" with the ESA. First, the court concluded that the Secretary had performed a comprehensive analysis of all the ramifications of the lease sale.[13] Second, the court reasoned that the Secretary, who was meaningfully apprised of the biological considerations surrounding the proposed action, could, and did "reasonably conclude that the

lease sale did not endanger" the listed species. Third, the court concluded that § 7(d) did not preclude the lease sale: "Plainly, the preliminary activities permitted by this lease sale entail no irreversible or irretrievable commitment of resources with respect to the Agency action which has the effect of foreclosing alternative measures which avoid jeopardizing the continued existence of any endangered or threatened species." 642 F.2d at 612 (alterations omitted).[14]

*Browner* and *North Slope* are instructive because they rebut Plaintiffs' argument that a Federal agency never has the authority to proceed with proposed action without *completion* of consultation with NMFS. More importantly, however, the cases provide insight into when an agency may so proceed. Notably, in both *Browner* and *North Slope,* the action agencies both had direct oversight from the NMFS or the Secretary of the Interior regarding the steps the agency decided to take prior to completion of consultation.

Defendants also cite to *National Wildlife Federation v. National Park Service,* 669 F.Supp. 384, 390 (D.Wyo.1987), to support its § 7(d) determination. However, as in *North Slope,* the action agency in that case (the National Park Service) had the benefit of the Fish and Wildlife Service's (FWS) review of the proposed action prior to proceeding with the plan. There, the FWS specifically concluded that an interim management plan "would not jeopardize the continued existence of the grizzly bear." *Id.* at 387. As

**13.** The court addressed the question of whether the dictates of the ESA applied to "agency action" which is an oil exploration project viewed (a) as a continuum of planned events, or (b) as discrete segments of a multistage Outer Continental Shelf Lands Act (OCSLA) venture. 642 F.2d at 608–09. The court opted for the latter determination, and agreed with the defendant's contention that the multistage flexibility contemplated within OCSLA was an indication that ESA "endangered life" considerations should be entertained stage-by-stage. Thus, the court found that a biological opinion focused on one stage of the proposed action was "comprehensive" for purposes of the ESA. *Id.*

**14.** The Court of Appeals affirmed the district court's determination that § 7(d) was not violated. The district court concluded that:

[T]he lease sale and pre-exploration activities do not violate § 7(d). Money invested in research of any kind cannot be considered wasteful if it provides the basis for informed decision-making, and is in all likelihood valuable in its own right. As the government correctly points out, the development of information (the crux of initial post-lease sale activities) should help avoid conflicts rather than create them. 486 F.Supp. at 357. The district court also reasoned that the information gathered in the post-lease sale activities would be useful in other arctic OCSLA activities, even if a subsequent § 7(a)(2) violation precluded production in that case. Also, the district court recognized that the parties involved in the action (the Government and the purchasers of leases) were prepared to take the risks associated with the lease sale. *Id.*

the NMFS has refused to concur in the Forest Service's interim plan here, *National Wildlife Federation* is distinguishable from this case.

 In light of the cases discussed above, the court frames the precise issue presented here as follows: Can the Forest Service, after consultation on the Elk Creek allotment has been initiated with the NMFS under § 7(a)(2) but before its completion, proceed to turn out livestock on two of the three pastures without an NMFS biological opinion or concurrence, if the Forest Service makes a unilateral determination that the action is not likely to adversely affect a listed species? After a thorough review of the requirements of the ESA and the relevant case law, this court must answer this question in the negative.

The court must necessarily consider whether the Forest Service's piecemeal assessment is sufficient to warrant a modification of the pending Order. In *Burford,* one issue before the Ninth Circuit was whether federal agencies violated the ESA by selling oil and gas leases on 1,300,000 acres of national forest land without preparing a comprehensive biological opinion encompassing the impact of post-leasing activities on threatened or endangered species. 848 F.2d at 1442–43. There, the Forest Service initiated formal consultations with the FWS as required under the ESA in order to determine whether surface-disturbing activities of the oil and gas lessees jeopardized the continued existence of certain species. *Id.* at 1444. Both the Forest Service and the FWS decided there was insufficient information about the nature of post-leasing oil and gas activities to render a comprehensive biological opinion considering anything more than the lease sale itself. Thus, the FWS proposed ongoing consultation and preparation of additional biological opinions at various stages of post-leasing activities. *Id.* In concluding that the ESA did not permit the incremental-step approach advocated by the federal defendants the court declined to

carve out a "judicial exception to the ESA's clear mandate that a comprehensive biological opinion ... be completed before the initiation of the agency action." *Id.* at 1455. The court accordingly enjoined further surface-disturbing activities on the national forest land until the FWS prepared biological opinions assessing the potential impacts of all post-leasing activities. *Id.* at 1458. *Burford* thus suggests that Defendants' approach is not acceptable here because it does not consider the effect of grazing on the Elk Creek allotment as a whole.

In *Pacific Rivers v. Thomas,* 30 F.3d 1050 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1793, 131 L.Ed.2d 721 (1995), a previous action involving the parties and similar issues here, the Ninth Circuit ruled that § 7(d) only applied after an action agency initiated consultation under § 7(a)(2). There, the court concluded that the district court erred by accepting the Forest Service's conclusion that ongoing and announced timber, range, and road projects that may affect Snake River chinook salmon were not irreversible or irretrievable commitments under § 7(d) because the Forest Service had not yet initiated consultation. *Id.* at 1056–57.[15] Importantly, the Ninth Circuit found it unnecessary to address the district court's rulings on whether the various commitments of resources by the Forest Service were irreversible or irretrievable. Rather, the court remanded the case to the district court to determine (once the Forest Service initiated consultation on the proposed plans) *whether the ongoing activities or announced activities could proceed during the consultation period.* *Id.* at 1057. In dicta, the court stated:

> [The district court] may find guidance in *Lane County,* where we held that the Bureau of Land Management could not go forward with any new sales of timber until consultation on a forest management plan and its effect on the threatened species was completed. More importantly, we held that timber sales constitute per se irreversible and irretrievable commitments

---

**15.** The Ninth Circuit described *Burford* as rejecting the FWS's suggestion "that projects it unilaterally determined were not irreversible and irretrievable commitments of resources could go forward even though it had not obtained an adequate biological opinion as required by § 7(a)(2)." 30 F.3d at 1056.

of resources under § 7(d) and thus could not go forward during the consultation period.

*Id.*

The Forest Service places significant emphasis on the district court's decision on remand in *Pacific Rivers. See* Exhibit 2 to Motion to Modify. In that opinion, the court set forth a two-pronged test for its § 7(d) analysis. The court stated that the Federal agency is only prohibited from making those commitments which involve the following two elements: (1) an irreversible or irretrievable commitment of resources; (2)·which foreclose the formulation or implementation of reasonable and prudent alternatives. *Id.* at 7.

Constrained by the language of the Ninth Circuit's remand, the district court ruled that timber sales could. not go forward because they constituted per se irreversible and irretrievable commitments of resources which violated § 7(d). The court further reasoned that the second prong of the analysis was troublesome; the court aptly pointed out that determining whether "reasonable and prudent alternatives" are foreclosed necessarily implies that a biological opinion *is completed* by the NMFS, the body charged with identifying such alternatives during the consultation process. *See* 50 C.F.R. § 402.02. Importantly, the court recognized that if it were to accept the Forest Service's arguments, it would be engaging in the impermissible recharacterization of a "may adversely affect"/"not likely to adversely affect" determination to a "no effect" determination. *Id.* at 9–11.

However, in its analysis of grazing and removal of downed timber, the district court departed from its earlier reasoning. While the court found that the Forest Service could not show that continuation of "not likely to adversely affect" grazing and timber removal might not foreclose the implementation of

such alternatives, it subsequently concluded that these activities are "simply not irreversible because they are subject to amendment and modification by the [Forest Service] at any time." *Id.* at 13. The court reasoned, "[c]attle may be moved, fenced, and herded to control their impacts throughout the duration of the permit. Similarly, timber may be moved by air, vehicle or animals and removal times may be altered to avoid sedimentation concerns." *Id.* In reaching this conclusion, the court did not indicate why it did not follow its earlier reasoning, and effectively altered a "may adversely affect" determination to a "no effect determination" with respect to grazing and removal of downed timber.[16]

Notably, the district court read the Ninth Circuit's instructions on remand as, "once the federal defendants initiate consultations on the [Land Resource Management Plans], *certain activities might proceed if I find that to do so would not violate § 7(d)*." *Id.* at 14. However, upon closer examination of the Ninth Circuit's language, this court finds that two options were suggested to the district court: it could either prohibit any activity by the Forest Service pursuant to the proposed plans until consultation was complete, or it could engage in a § 7(d) analysis. *See* 30 F.3d at 1056. Because the district court concluded that it was required to conduct a § 7(d) analysis, it does not appear that the court considered the possibility that no action could be taken until the consultation was complete. For these reasons, the court does not follow the district court's opinion on remand in *Pacific Rivers.*

In further support of their § 7(d) determination, Defendants argued at the hearing that the NMFS documents cited by Plaintiffs in their opposition memoranda reference only the continued problems with the Stanfield Unit, which is not the subject of the Defen-

---

**16.** This court notes here that the district court specifically held:

> Because I find that ongoing ["not likely to adversely affect"] grazing and removal of downed timber do not constitute irreversible or ˉirretrievable commitments of resources at the present time, these activities may proceed pending completion of § 7(a) consultations ... This is not to say, however, that these activities

may *never* constitute 7(d) commitments. The Forest Service remains under a duty to ensure that these NLAA activities do not become likely to adversely affect activities which might pose a threat of harm to the listed species.

*Pacific Rivers Council v. Thomas,* Opinion at 14. Here, Plaintiffs argue that turning out the livestock on Elk Creek would constitute an irreversible or irretrievable commitment of resources.

dants' instant motion. *See* AR 26. Defendants direct the court, for example, to review certain language in an NMFS letter to the Forest Service that may indicate that the NMFS only has continued concern about the protection of the salmon with respect to the Stanfield Unit.[17] The court agrees that the NMFS appears to pay particular attention to the problems on the Stanfield Unit. However, the court cannot deduce from this alone that there is an absence of difficulties with the other units or that the NMFS is not concerned with the cumulative impacts on the Elk Creek allotment when considered as a whole.

Moreover, although not raised by either party, the court considers that the general time frame for completion of the consultation process is not objectively unreasonable; rather, Defendants' impending turn-out target dates have prompted their motion for modification.[18] However, this alone does not warrant the creation of an exception to the consultation requirement here. The record reveals that the NMFS, after it receives the requested documents from the Forest Service, is prepared to complete consultation within a 60–day period. *See* AR 26 at 3.

Furthermore, the court also finds particularly significant here the ESA regulation that authorizes Federal agencies, in limited circumstances, an opportunity to pursue "incremental step consultation." As the Forest Service does not discuss whether that provision can be applied here, the court assumes and concludes that it cannot or was not. *See* 50 C.F.R. § 402.14(k). That provision states:

> When the action is authorized by statute that allows the agency to take incremental steps toward the completion of the action, the [NMFS] shall, if requested by the Federal agency, issue a biological opinion on the incremental step being considered, in-

---

**17.** In suggesting that the turn out of the livestock on the Riparian Pasture and the Poker Ayers Units should not be controversial, the Forest Service focuses on the following language:

> In addition to the less than full protection of redds, the proposed grazing strategy on [the Elk Creek] allotment may retard recovery of vegetation and streambank stability. The [Boise National Forest] monitoring data from 1992 through 1995 show streambank stability in the 40% to 70% range in the Stanfield Unit, well below the PACFISH Riparian Management Objective of 80% and Land and Resource Management Plan biological opinion (NMFS 1995) guideline range of 90%. Stream reaches with similar levels of streambank damage and similar importance to salmon production elsewhere on BNF (Bear Valley and Sand Creeks) are treated with two to three weeks of early season grazing. The Stanfield Unit, however, would receive up to six weeks of later season use . . .
>
> We believe the Elk Creek grazing allotment proposal as received by NMFS on July 25, 1994, is "likely to adversely affect (LAA)" listed spring/summer chinook salmon. The proposal does not provide the physical separation needed to preclude trampling of salmon redds. The potential for a delayed recovery of streambank stability is also high enough to warrant the LAA determination. Thus, NMFS does not concur with the BNF's determination.

AR 26. However, upon close examination of the NMFS letter, the court notes that the NMFS treats the Elk Creek allotment as one unit for purposes of the consultation. While the court agrees with Defendants that the NMFS appears to make specific references to the Stanfield Unit, the court cannot agree with Defendants that the NMFS necessarily had no problems with the proposals for the other units. The court declines to engage in this type of speculation.

**18.** 50 C.F.R. § 402.14(e) provides:

> Duration and extension of formal consultation. Formal consultation concludes within 90 days after its initiation unless extended as provided below. If an applicant is not involved, the Service and the Federal agency may mutually agree to extend the consultation for a specific time period. If an applicant is involved, the Service and the Federal agency may mutually agree to extend the consultation provided that the Service submits to the applicant, before the end of the 90 days, a written statement setting forth: (1) The reasons why a longer period is required, (2) The information that is required to complete the consultation, and (3) The estimated date on which the consultation will be completed. A consultation involving an applicant cannot be extended for more than 60 days without the consent of the applicant. Within 45 days after concluding formal consultation, the Service shall deliver a biological opinion to the Federal agency and any applicant.

50 C.F.R. § 402.14(e). Alternatively, if additional data is needed for purposes of forming a biological opinion, the NMFS can request an extension of formal consultation and request that the Federal agency obtain additional data to determine how or to what extent the action may affect listed species. 50 C.F.R. § 402.14(f). If no extension of a formal consultation is agreed to, the NMFS will issues a biological opinion using the best scientific and commercial data available. *Id.*

cluding its views on the entire action. Upon the issuance of such a biological opinion, the Federal agency may proceed with or authorize the incremental steps of the action if: (1) The biological opinion does not conclude that the incremental step would violate section 7(a)(2); (2) The Federal agency continues consultation with respect to the entire action and obtains biological opinions, as required, for each incremental step; (3) The Federal agency fulfills its continuing obligation to obtain sufficient data upon which to base the final biological opinion on the entire action; (4) the incremental step does not violate section 7(d) of the Act concerning irreversible or irretrievable commitment of resources; and (5) there is a reasonable likelihood that the entire action will not violate section 7(a)(2) of the Act.

50 C.F.R. § 402.14(k). Importantly, NMFS plays a role in determining whether "the incremental step ... violate[s] section 7(d) of the Act concerning irreversible or irretrievable commitment of resources." This requirement persuades the court to reject Defendants' suggestion that they alone can make a unilateral determination as to whether the proposed "step" complies with § 7(d) under the circumstances present here.

Because this court concludes that Defendants must complete consultation with the NMFS prior to turning out the livestock on the Elk Creek allotment under the specific facts presented here, the court need not reach the merits of the scientific claims made in the Forest Service's § 7(d) determination.[19] In sum, in denying Defendants' Motion to Modify, this court is guided by the Supreme Court's reasoning in *TVA v. Hill*:

"[W]e are urged to view the Endangered Species Act 'reasonably,' and hence shape a remedy 'that accords with some modicum of common sense and the public weal.' But is that our function? We have no expert knowledge on the subject of endangered species, much less do we have a mandate from the people to strike a bal-

ance of equities on the side of the [Forest Service or the permittees]. Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as 'institutionalized caution.'" 437 U.S. at 194, 98 S.Ct. at 2302 (internal citation omitted).

The court concludes that the Forest Service has not met its burden of showing that a modification to this court's Order on Pending Claims is warranted. In so concluding, the court declines to supplant the duty of that NMFS to issue an informed opinion on the Forest Service's "not likely to adversely affect" determination with respect to the Elk Creek allotment as a whole.

### CONCLUSION

For the reasons stated above, the court DENIES Defendants' Motion to Modify Order on Pending Claims and DENIES AS MOOT Defendants' Motion to Strike Declaration of Cindy Deacon Williams.

IT IS SO ORDERED.

---

**19.** Similarly, the court need not reach the question of whether the arbitrary and capricious standard or the de novo standard applies to the Forest Service's conclusions reached in its § 7(d) determination. For the same reason, the court DENIES as moot the Forest Service's motion to strike the Declaration of Cindy Deacon Williams, attached to Plaintiffs' Memorandum in Opposition to Defendants' Motion to Modify.